SOUTH CENTRAL SECURITIES CO., RESPONDENT, v. W. T. VERNON ET AL., DEFENDANTS; W. C. HOWARD MOTORS CO., APPELLANT.— 54 S. W. (2d) 416.

Kansas City Court of Appeals.   October 3, 1932.

*Lancie L. Watts* and *Paul E. Bayse* for respondent.

*Sparrow & Patterson* and *Edward J. Tangney* for appellant.

TRIMBLE, P. J.—In an attachment suit on a promissory note for $1803.48, dated December 15, 1925, given by W. T. Vernon to Homer Roberts, doing business as Roberts Company, (which note was assigned by payee to plaintiff South Central Securities Company, and on which note was a credit of $1182.23), the attachment writ issued to defendants Vernon and Roberts; and "W. C. Howard Motors Company," a corporation, was summoned as garnishee.

In answer to the interrogatories propounded to the garnishee, the latter denied that at the time it was summoned, it had in its possession, custody or charge, any goods, chattels, moneys, credits or effects belonging to defendants W. T. Vernon, or Homer Roberts, doing business as Roberts Company, and further asserted that it has not had, nor does it now have, any such; that it was not in any wise indebted to, nor has it been, nor is it now, in any wise indebted to, said defendants; nor was it bound in any contract to pay, nor has it become, nor is it now bound to pay, said defendants, or either of them, any money which is not yet due.

In denying garnishee's answer, plaintiff set up that on December 15, 1925, defendant Vernon, through his agent, defendant Roberts, ordered from the garnishee, W. C. Howard Motors Company, one "Rickenbacher Sedan automobile" and paid to said garnishee $900; that said automobile was to be delivered to Vernon at Detroit, Michigan; that said garnishee failed to deliver said automobile to Vernon and also failed to return said $900, whereby garnishee became indebted to said Vernon in that sum.

Wherefore, judgment was prayed against defendants as sought in the petition, and judgment for $621.25 (the balance due on said note) was prayed against said garnishee.

The reply of garnishee to plaintiff's denial of garnishee's answer was a general denial.

At the conclusion of the trial in the garnishment proceedings, the jury returned a verdict finding that garnishee "*has* $900 in its possession belonging to defendant Vernon," wherefore, garnishee was ordered to pay that sum into court within ten days and be released from further liability.

The attachment suit was then tried. Defendants Vernon and Roberts were found by the court to be nonresidents of Missouri, and to have made default; the evidence was submitted to the court, the attachment was sustained, defendants were found to be indebted to plaintiff in sum of $621.25, with interest at eight per cent from December 30, 1926, amounting to $234.83, making a total of $856.08, for which judgment was rendered to be levied out of the goods, moneys or credits in the hands of the attached garnishee.

The latter, instead of paying said $856.08 into court, duly appealed

Defendants Roberts and Vernon are colored men. The former, in and prior to, December, 1925, was engaged in selling automobiles at 18th and Vine streets in Kansas City, Missouri, under the business name of ''Roberts Company.'' Vernon was the Bishop of the African Methodist Episcopal Church with headquarters in Kansas City, Kansas. The plaintiff was, and is, ''an automobile finance concern,'' buying notes given on the purchase price of automobiles secured by chattel mortgage on the automobile purchased, and which concern was in the habit of, in this way, financing the sales of automobiles made by Roberts.

Sometime during said month of December, 1925, Bishop Vernon desired to purchase of Brother Roberts, largely on credit, a Rickenbacher Sedan Automobile. Together, the brethren went to plaintiff's office, seeking to know whether plaintiff would finance the deal to the extent of accepting Brother Vernon's note for $1803.48, secured by chattel mortgage on the motor car, and were readily and graciously informed that such arrangement could be made. Thereupon, Brother Roberts sold to Brother Bishop Vernon one Rickenbacher Sedan Automobile, Motor No. 28140, Factory or Car No. 28029, Year Built 1926, Model E. for a part of the purchase price of which, the Reverend Bishop Vernon gave to the Roberts Company, his negotiable, promissory note for $1803.48, secured by chattel mortgage on said car.

About that time, that is to say, very shortly after, the Reverend Bishop received ''a Call from the Lord'' (or whatever it is that African Methodist Episcopal Bishops receive) to ''come up higher,'' and, obeying the Call, was transferred to Detroit, Michigan, so he requested that delivery of the purchased car be made to him there. Plaintiff consented to this, but discovered that the note given about December 10, 1925, in Missouri, would not hold water in Michigan, so a new note and mortgage, dated December 15, 1925, were drawn up and sent to Bishop Vernon at Detroit where he properly executed them and returned the same to plaintiff. Presumably the old note and mortgage were destroyed or sent back to the Bishop. The old, as well as the new, note and mortgage were made payable to Roberts Company and were assigned by the payee to plaintiff who were to, and did, pay Roberts Company $1540 therefor but in fact paid $1460 in one check and $80 in another, which last check plaintiff required Roberts to endorse and turn back to plaintiff to apply on Roberts' account to plaintiff, so that the net amout of cash Roberts received was the $1460 proceeds of the other check.

At that time, and prior thereto, Roberts had been doing business with garnishee, appellant W. C. Howard Motors Company, an automobile distributor and seller of parts. He had a running account with said company, which, at times, was nearly paid up, but in De-

cember, 1925, he owed about $1000 on said account, for automobile parts and accessories, and the company was pressing him to settle the account before the first of the year. Consequently, on December 14, 1925, Roberts, presumably out of the $1460 he had received, procured from the Linwood State Bank a cashier's check for $900, and gave it to garnishee and appellant here, W. C. Howard Motors Company, to apply on his account. We will speak further of this $900 later on.

Returning now to Bishop Vernon in his Episcopal Palace at Detroit, we fail to find anything in the record to show positively whether the Reverend Bishop ever received his motor car. In the mortgage he signed, is a statement of Roberts to the plaintiff that the Bishop was waiting in Detroit for the new Model and "maybe he wasn't never going to take delivery." At any rate, it is clear that the Bishop never made any payments on his promissory note for $1803.48 which plaintiff bought for $1540, and the first payment due in January, 1926, as well as several more monthly installments became due and were in default before anything was attempted to be done about it.

At this time (1929), both defendants were nonresidents, Roberts having gone to Chicago to enter business there, and the Bishop still in Detroit (just across the river from Canada, with all the privileges and conveniences appurtenant to that pleasant and useful propinquity). Not being able to get them into court by ordinary process, plaintiff brought attachment and garnisheed appellant, basing garnishee's liability (as heretofore shown) on the theory set forth in the plaintiff's denial of garnishee's answer, namely. that Vernon. through his agent Roberts, had ordered the automobile and had paid thereon, through said agent, the sum of $900. said automobile to be delivered to purchaser at Detroit; but that garnishee failed to deliver same as agreed, and failed to return to defendant Vernon said $900, whereby garnishee was thus indebted to Vernon.

Neither Vernon nor Roberts testified at the trial of the garnishment proceedings.

Evidence was introduced tending to show the purchase of the automobile and agreement to deliver at Detroit, the agreement of plaintiff to assist in financing it as heretofore stated, the execution of the $1803.48 note and chattel mortgage, and the reduction of said note by payments, collected by plaintiff *from Roberts*, to $621.25. The execution of the new note and chattel mortgage; the return of same after execution by Bishop Vernon, this being further shown by the following letter from the Bishop:

"AFRICAN METHODIST EPISCOPAL CHURCH
Bishop William T. Vernon, A. M. D. D. L. L. D.
Presiding
348 Josephine Street, Detroit, Mich.

490

January 1, 1926.
South Central Securities Co.,
Kansas City, Mo.
Gentlemen:—

I send enclosures as per your request.

Respectfully,

W. T. VERNON.''

In addition to the foregoing, Ricker, witness for plaintiff, testified that when payments became delinquent, he went to see Roberts, who explained that the factory was changing models and Brother Vernon decided he would wait for the new model before taking delivery, which would be in the course of a week or two longer; that after two or three weeks Roberts told witness delivery had not been taken but ''he was going to.''

Afterwards, in April, 1926, Ricker, getting no payment, says he wrote appellant garnishee a letter, and appellant replied that it would look into the matter. Not hearing anything further, witness says he went to the W. C. Howard Motors Company shortly after April 22, 1926, and spoke to an officer of said company, Mr. Nelson, and asked him why he couldn't get a clear expression of what he wanted in writing; that he (witness) did not see why it was necessary to investigate. Witness testified that he said to Nelson, ''Either Mr. Roberts has paid for the car or he has not;'' that Nelson finally replied, ''Yes, he paid $900 on it, but he hasn't completed payment and the delivery hasn't been made.'' To which witness replied, ''Since the deal is really called off, I want *my* $900.'' And Nelson replied, ''I won't give it to you, I am going to apply it on what Roberts owes us.''

Witness further testified that he then went to Roberts, who, he thought, was going to turn over the full $1460, and said to him, ''Here, I found you only paid $900.'' Roberts replied that that was right and that witness Ricker's request, produced a receipt for $900. There was then offered in evidence the cashier's check for $900 issued by the Linwood State Bank, and a receipt of appellant W. C. Howard Motors Company for $900. Witness further said he went with Roberts to the bank and examined this cashier's check for verification of Roberts' statement that he has paid $900 on the Rickenbacher automobile deal. The receipt issued by the W. C. Howard Motors Company for the $900 is not itself set out in the record, as it is lost. The court reporter makes affidavit to its contents, saying that it was a printed form of receipt of the Howard Motors Company by West, written in lead pencil, and bearing at the bottom thereof the words ''Vernon Rickenbacher Deal.''

Witness then testified that *after* the conversation with Nelson of the appellant Company and after Roberts' statement the car would

not be delivered to Vernon, "I made an arrangement with Roberts that we, (plaintiff South Central Securities Company), would, from time to time, finance his cars—he having some trouble doing that—and that we would take a portion of the profits out of each one of the deals he made and credit it to *his* note. In that way I worked it down to six hundred, twenty-one dollars." Witness further testified that he financed quite a number of cars for Roberts that were procured by him through W. C. Howard Motors Company, since this deal.

On cross-examination, Ricker testified that the note of December 15, 1925, was sent to Detroit for Vernon to sign and it replaced the note given December 11, 1925; that Roberts Company was Homer Roberts; that his (witness'), company bought ten or fifteen notes from Roberts before this; that the first Vernon note was bought December 11th; that Roberts made payments on the substituted Vernon note, out of his profits on other sales which plaintiff financed, until there was only $621.25 due; that Roberts left Kansas City three years before the trial and suit was brought after Roberts left; that no effort was made to collect off appellant from April, 1926, to November, 1929, when suit was brought.

Witness Ricker admitted that when his company bought Roberts' note, the money was Roberts' money and that he had a right to do whatever he pleased with it and to apply it on his account with appellant; that he did not know where Vernon was at the time of the trial, February, 1931; that Roberts left Kansas City in 1928 and went to Chicago; that he had written Vernon and Roberts but had never received a reply; that he had never tried to collect the note through attorneys or otherwise, either at Detroit or Chicago. He, witness, did not know what conversation Roberts had with the W. C. Howard Motors Company about the application of the $900, and that as far back as 1926 Nelson told him he was going to apply it on Roberts' account. Witness also identified the $900 cashier's check as one he had seen, in company with Roberts, at the Linwood State Bank, and that it *then* had the words "Vernon Deal" written on it apparently in Roberts' handwriting, and appearing under the words "Cashier's Check" in lower left-hand corner of the check, but witness did not know when the words "Vernon Deal" were placed on the check; that his reason for not bringing suit from April, 1926, to November, 1929, was because he thought he had a chance to work it out of *Roberts* and "I would much rather have him pay for it the way he started than have a lawsuit." This was all of the plaintiff's case.

For the appellant garnishee, Nelson, who, at the time of the trial, was Secretary and Treasurer of the Century Motors Company, testified that in 1925 he was in charge of the retail sales department of W. C. Howard Motors Company; that he never knew William T.

492

V ernon; that he knew Roberts who sold new and second-hand auto- mobiles at 18th and Vine streets; that W. C. Howard Motors Com- p ay sold Hupmobiles and Rickenbachers in December, 1925; that th company frequently sold cars to Roberts who bought and then re. ld them. Roberts not only had one of the W. C. Howard Motors Co: pany cars in his display room, but bought parts from it (the Con any) and sent autos to it for servicing. That, on December 20, . 25, Roberts was indebted to W. C. Howard Motors Company for a ut $1000. Witness then identified a statement of account, being edger sheet, showing detailed credits, debits and balance due, of Roberts; that for three or four months prior to December, 1925, witness had been trying to get Roberts to take care of his account, and about the middle of December he gave Roberts a certain num- ber of days to get the money therefor or they would cease to have business relations with him, and that Mr. Howard, president of said company, was making the same efforts and was threatening to take their cars off of Roberts' display floor; that between the 14th and 21st of December, 1925, Roberts was in the W. C. Howard Motors Company's place of business and gave him a check for $900, and it did not have the words "Vernon Deal" on it. When Roberts gave him the check, he asked witness to apply it on Roberts' account. Witness turned check into cashier's office and told them to apply it on Roberts' account; that Roberts, at that time, said nothing about Vernon purchasing a car; that he had never heard of Vernon at that time, nor had the Howard Motors Company ever done any bus- iness with Vernon, and the latter had never purchased a car from Howard Motors Company; that Vernon never demanded a car from said company, nor did he or anyone for him ever pay for such a car; that neither Vernon, nor anyone for him, ever offered to pay W. C. Howard Motors Company for a Rickenbacher Sedan; that Vernon never claimed that the Howard Motors Company had $900 that had been paid to it to apply on the purchase of a car, nor did Vernon ever demand a return of the said $900 nor did Roberts ever ask a return of it to him.

Witness Nelson further testified that Ricker for plaintiff had never called up to ask anything about delivering Vernon a car prior to the time Roberts gave him the $900 check to apply on his account; that sometime in April, 1926, Mr. Ricker came to see him (witness) personally and said he was trying to work out some way to collect money from Roberts and wanted to know if the Howard Motors Company did not have a $900 check of Roberts that he could get, to which witness replied in the negative; that Ricker asked witness whether Roberts had paid $900 in December and witness told him he had, but that Roberts had paid it on his account and it had been applied thereon and Roberts did not have any credit balance.

Witness Nelson also testified that Ricker telephoned him along in January asking if Roberts had made any arrangement for the delivery of a new car in connection with the note he had, to all of which witness replied telling Ricker he knew nothing about it. None of this testimony was denied or disputed in any way.

Witness Nelson, on cross-examination, further testified that he knew of no deals wherein the W. C. Howard Motors Company sold a car direct to the purchaser and Roberts handled the financing, but the Howard Motors Company handled the financing itself.

W. C. Howard, president of the W. C. Howard Motors Company, testified, in addition to those matters testified to by Mr. Nelson, that after Roberts had paid Nelson the $900 and directed that it be credited on his account, all in response to appellant's demand that Roberts settle his account, Roberts came back to appellant's place of business and had witness' bookkeeper, West, to give him a receipt for $900, which West did, and which is the receipt plaintiff offered in evidence, and when the accounting department discovered the apparent conflict in Nelson's directions to credit the note on Roberts' account and the bookkeeper's notation that the $900 receipt was on the Vernon Rickenbacher deal, witness, Howard, spent several days trying to get Roberts in to explain the matter, and finally when Roberts was reached, the latter said, ''Well, that fellow (meaning and referring to Vernon) isn't going to buy a car anyway.'' Witness testified this was the first time he had ever heard of Vernon, and Roberts told him the $900 was to be credited on his (Roberts') account. Howard says he then asked Roberts to return the receipt but Roberts said he had lost it.

Appellant's cash book, showing receipt of $900, could not be found; but the ledger account, which is posted from the cash book, was in evidence in detail and show a credit to Roberts' account of cash $900 on December 21, 1925. The said ledger shows no debits to Roberts' account from and after November 30, 1925, to June 11, 1926, showing that the W. C. Howard Motors Company sold no car to Roberts on or about December 10th or 15th, 1925, nor did it charge one to him.

In rebuttal, Jno. Lawson testified for plaintiff that he was assistant cashier of the Linwood State Bank; that, in his opinion, the words ''Vernon Deal'' were in the handwriting of Roberts; but witness could not say when they were written there, and he did not notice they were on there when the check came back; that the ink used in writing them was the kind of ink used in the bank. This was all of the testimony in the case, and at its close, the appellant garnishee offered an instruction in the nature of a demurrer to the evidence, but this was refused.

A number of alleged errors are assigned which, if they exist, call

for a reversal and remanding of the case for a new trial. Others, however, if well founded, are such as will prove fatal to plaintiff's cause of action and hence they should be disposed of first.

In considering the rights of the parties herein, it is well to bear in mind certain fundamental rules or principles governing garnishment proceedings where the garnishee's answer is denied by the plaintiff. The *sole issues* to be tried are those raised by these two pleadings, and plaintiff's denial must "contain specially the grounds upon which a recovery is sought against the garnishee." [Sec. 1414, R. S. Mo. 1929.] The burden is on the plaintiff to show garnishee's indebtedness to the defendant debtor and liability must be made to affirmatively appear; and in order to subject a garnishee to a liability denied by it, the plaintiff must show facts which would enable the defendant debtor to maintain a suit against the garnishee. [Bambrick v. Bambrick Bros. Const. Co., 152 Mo. App. 69, 76.] In such cases, the plaintiff, in order to recover, "must prove the indebtedness in the same manner as the defendant would be compelled to do had he sued the garnishee." [Brosius v. Sunflower Lead & Zinc Co., 149 Mo. App. 181, 187.] "In equitable garnishment, as in legal process having a similar object in view, nothing more can be accomplished against the debtor of the defendant than in a direct suit against the former by the latter. The method used to reach the funds in the garnishee's hands cannot alter his *status* nor enlarge or vary the grounds of his defense." (Italics the court's.) [Johnson v. Geneva Pub. Co., 102 Mo. 102, 104. See also Firebaugh v. Stone, Garnishee, 36 Mo. 112, 115.] "The denial of the garnishee of indebtedness to the defendant in the execution in any moneyed demand gives him a *prima-facie* case, and the plaintiff, in order to recover, must prove such indebtedness, just as the defendant in the execution would have been compelled to do had he sued the garnishee for his debt. In other words, the garnishment cannot operate to change the rights of the parties. The defendant ought to be placed in court on the same terms that he would have been had he been sued by his own creditors; and in that case it would have been incumbent on the creditor to prove his claim." [Karnes v. Pritchard, Garnishee, 36 Mo. 135, 137.]

It is well established, therefore, that before plaintiff can recover from garnishee herein the $900 in controversy, or any part thereof, it must show every fact which defendant Vernon must have shown had he sued the garnishee for the money.

Referring then to plaintiff's denial of the garnishee's answer, which denial contains the foundational facts of plaintiff's cause of action against the garnishee and corresponds to the petition in any other suit, we find that it is alleged that *Vernon, through his agent Roberts, ordered the automobile* from the garnishee, W. C. Howard Motors Company, and *paid to it the sum of $900.*

There is, however, no evidence in the record to support this allegation. The undisputed facts show that Vernon bought an automobile *from Roberts.* They went to plaintiff to see if it would finance the paper by advancing the unpaid purchase money on Vernon's note and chattel mortgage on the car, and plaintiff agreed to do so. Thereupon Roberts *sold a car* to Vernon, and the latter partly paid for it with his note for $1803.48, secured by Vernon's chattel mortgage on the car. Roberts then took the note secured by chattel mortgage, which *was his,* and *sold the note* to plaintiff for $1,540. Of this amount the plaintiff took $80, or rather *retained* $80, and *applied it to the payment of Roberts' account* or debt to it, thus clearly recognizing that this amount at least belonged to Roberts. Both of them thus recognized it as Roberts' property, and Roberts took the remainder, in the form of a check for $1460, and, treating it as his own, deposited it in his bank, and took therefrom a cashier's check for $900, drawn to his own order—i. e., Roberts Company which was Roberts himself— and took it to the garnishee, W. C. Howard Motors Company, and it was there credited to Roberts' debt or account, as is clearly shown by the entry, at the time and in the usual and ordinary course of business, on the books of said garnishee. There is not a word of evidence showing that *he,* Roberts, contracted for, or purchased from, garnishee a Rickenbacher Sedan, paying partly for it with the $900, or how the balance of the supposititious purchase price was to be or in fact was paid. Nelson, of the Howard Motors Company, says, and it is undisputed, that Roberts gave him the check with directions to apply it on Roberts' account of $1,000 and overdue, and which they were pressing him to pay up. It is true, the cashier's check *later* turned up with the words "Vernon deal" on it, but Nelson says positively they were not on the check when he received it. Nobody says they were, or *when* they were placed on the check; and the situation is such as to give rise to the thought that Roberts placed them there himself afterward, *either* to show that it originated in a transaction concerning the purchase of a car he was going to or had planned to sell Vernon, *or* in an attempt on his part to *muddy the water* should an investigation be made or trouble raised with him as to the disposition he had made of the $900. Roberts was the man who was behind in his business accounts and pressed financially on all sides, and he is unquestionably shown to be the "Senegambian in the woodpile" or at least one of them, causing all the trouble. But it is not shown that garnishee knew of any irregularity, or was party to it, at or before the check was received or credited on Roberts' account.

The receipt given by the bookkeeper of the Howard Motors Company, which receipt Roberts sought and obtained *after* he had applied the check on his account, in no way proves that the money represented by the check was Vernon's money, but rather proves the contrary

since it recites that the money is received from Roberts Company, that is to say, Roberts.

Not only does the evidence fail to support one of the necessary and basic allegations of plaintiff's cause of action, but the *pleading* fails to state a fact which is necessary to recovery since plaintiff cannot recover against the garnishee, unless the facts are stated *and proved* which are sufficient to enable Vernon to recover *had he sued.*

Now, it is nowhere pleaded, nor is it proved (indeed the contrary is shown), that Vernon was ready and willing to pay, and offered to pay, the balance of the purchase price of the car. The only pleading is that Vernon, through his agent Roberts, ordered a car, and, through his agent, paid $900 on the purchase price, but garnishee failed to deliver the car, as a result of which garnishee became indebted to Vernon in that sum. Not only did the pleading fail to show that Vernon was entitled to recover from the garnishee as a defendant, but the evidence, *conclusively* shows that neither Vernon nor Roberts ever requested delivery of a car, nor attempted to obtain delivery, nor ever manifested, by word or deed, the slightest interest in a car or in any sum paid on the purchase price. This not only shows that no car was ever ordered from garnishee and no sum ever paid on it, but it also shows that, if there had been by Roberts as Vernon's agent (which he was not) Vernon would be in no position to maintain a suit against W. C. Howard Motors Company for the return of money paid thereon. If two persons enter into an executory contract and one of them pays money on the agreed consideration and afterwards fails and refuses to fulfill the contract on his part, he cannot recover back the portion of the money paid. [Crews v. Garneau, 14 Mo. App. 505, 511. See also Felix v. Bevington, 52 Mo. App. 403, 406; Davis v. Burada-Ghio Real Estate Co., 115 Mo. App. 327, 338; Norris v. Latchworth, 167 Mo. App. 553, 557, 562; Roberts v. Weber Motor Car Co., 232 S. W. 225, 226.]

As heretofore stated, the garnishee at the close of the entire case demurred to the evidence. This should have been sustained, as we view the case, because: (1) There is no evidence that Vernon, or Roberts for Vernon, ever ordered a car from the garnishee; (2) There is no evidence that garnishee, prior to receiving the $900 and crediting Roberts' account, knew anything about Vernon or Vernon's purchase of a car; (3) There was no evidence that Roberts was Vernon's agent; and (4) Conceding for the sake of the argument only, that Vernon did order a car from garnishee and paid $900 on it and garnishee failed to deliver it, Vernon would have had an election of remedies. He could have (a) rescinded the contract, if not himself in default, or (b) stood on the contract and sued for damages. As a matter of fact he has never evinced the slightest indication of any thought or desire to do either one or the other; but, in any event,

the plaintiff cannot make an election for him. Peycke Bros. Comm. Co. v. Sandstone Cooperation Co., 195 Mo. App. 417, 419-420, and one of the elections would have made the damages *unliquidated* and in that case the claim could not be reached by garnishment. [Peycke Bros. Comm. Co. v. Sandstone Cooperation Co., 195 Mo. App. 417, 420.]

It seems to us, aside from all this, that there is another potent fact in this case. When the first and possibly second monthly payments on the Vernon note became delinquent, plaintiff's president called *Roberts*. Had it believed the *garnishee* was selling the car to Vernon, it would have called Mr. Nelson or Mr. Howard, but it called Roberts. The latter said Vernon had delayed taking delivery so as to get a later model, although the mortgage called for a 1926 model. In April, with no payment made, plaintiff's president called on garnishee and demanded *his* $900. Just how the plaintiff could claim this $900 as its money is difficult to understand, but, in such event, it manifestly did not consider the $900 belonged to Vernon, as it is now contending in this lawsuit. Whether Mr. Nelson said he would not give it to him because he *had* or *was going* to apply it on Roberts' account, is of no significance, for the record undoubtedly shows that he did apply it on Roberts' account on December 21, 1925, as *Roberts'* cash. And then what did plaintiff's chief officer do? He went to *Roberts* and arranged with *him* to pay off the Vernon note, by crediting amounts deducted from sales made by Roberts in subsequent transactions, from the face of the note, and these credits appear on the note until Roberts had reduced the note to $621.25. Then Roberts quit paying, and the plaintiff waited for nearly *two years* after Roberts had left town, to sue Roberts and Vernon, by attachment, and garnishment against appellant for this $900. Plaintiff says it did not try to collect the balance from Vernon or Roberts, except by letters written. But whether it exhausted every means it had, or not, to collect from Vernon or Roberts, or both, the fact remains that it looked to *Roberts* and to Roberts *alone,* to collect the note he had endorsed to it, and *at no time* did it treat any of the payments as coming from Vernon, nor did it deem Vernon as a source from which it might obtain payment of any indebtedness to it, until it began this garnishment suit. The plaintiff waited until long after Roberts had quit doing business with garnishee, indeed, until after Roberts had left town, and until after its opportunity to secure some sort of settlement of garnishee's open account against Roberts had passed, and then plaintiff claimed as its own the $900 which Roberts had paid to garnishee in settlement, or almost complete payment, of his open account and which had been passed to and credited on that account for nearly four years.

So that, under the undisputed evidence in the case, the $900, when it was delivered by Roberts to garnishee to be credited on Roberts' account, belonged to Roberts and not to Vernon, and hence there is no ground on which, or theory under which, the plaintiff can now at this late date, or at any earlier time for that matter, maintain garnishment proceedings against the garnishee who is appellant here. The trial court should have so declared, by sustaining the demurrer at the close of all the evidence. Plaintiff is in no position to claim that even if the money was Roberts' it is entitled to a judgment since Roberts is also liable on the note, and this is true for several reasons: (1) Because the whole theory of *this* proceeding *against the garnishee* is that *the money was Vernon's,* (2) Because the right to a judgment against Roberts in an action against him, affords no ground for a judgment against garnishee, and (3) Because in the attachment suit he has a judgment against Roberts.

Plaintiff's point that the contract between Vernon and whoever sold him the car was mutually abandoned or rescinded, (and hence Vernon could have only one remedy, i. e., for money had and received, and, therefore, plaintiff had not attempted in the case now before us to make an election for him), can afford plaintiff no help or relief, for even if the evidence had disclosed a mutual abandonment or rescission, nothing of this kind was pleaded in the denial as forming any part or basis of plaintiff's cause of action.

It follows from what has been said that the judgment must be reversed; it is so ordered. All concur.