Clara Ruby NYE, a minor, by her mother and next friend, Mrs. Ben Moore, Plaintiff-Appellant,

v.

Gloria JAMES, Defendant,

Farmers Mutual Automobile Insurance Company, Garnishee-Respondent.

No. 8180.

Springfield Court of Appeals.

Missouri.

Dec. 16, 1963.

Fred S. Selsor, Kansas City, for plaintiff-appellant, Murvyl M. Sullinger, Pittsburg,

Kan., Kuraner, Freeman, Kuraner, Oberlander & Lamkin, Kansas City, of counsel.

E. E. Thompson, Kansas City, William E. Haney, Topeka, Kan., for garnishee-respondent, Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

STONE, Judge.

Garnishment. Following a jury-waived trial on March 22, 1960, in the Circuit Court of Barton County, plaintiff Clara Ruby Nye, pro ami, obtained a judgment for $50,-000 against defendant Gloria James, a minor residing in Mulberry, Kansas (just west of the Barton County, Missouri-Crawford County, Kansas, line), for personal injuries sustained by plaintiff as the result of a vehicular collision on July 30, 1959, on U. S. Highway 69 near Fort Scott, Kansas, which involved a 1953 Ford sedan (hereinafter referred to as the Ford) then being driven by defendant Gloria in which plaintiff Clara was riding. Ownership of the Ford was evidenced by a *Missouri* certificate of title issued under date of July 1, 1957, to "Earl W. Long and/or Nancy Long, tenants by entirety" of Kansas City, Missouri. Policy No. 24–070486 of Farmers Mutual Automobile Insurance Company (hereinafter referred to as the policy), issued to "Nancy W. Long" as "named insured" for an initial policy period of six months from October 13, 1957, to April 13, 1958, and thereafter renewed for successive six-month periods, was in effect on the date of accident and, under Part I thereof, obligated Farmers Mutual "to pay on behalf of *the insured* all sums [within the then policy limits of $5M/$10M/$5M] which *the insured* shall become legally obligated to pay as damages" because of bodily injury or property damage "arising out of the ownership, maintenance or use of the owned automobile," to wit, the Ford. (All emphasis herein is ours.) That portion, here material, of the so-called omnibus clause of the policy provided that "the following are *insureds* under Part I: (a) With respect to the owned automobile, (1) the named insured and any resident of the same household, (2) *any other person using such automobile, provided the actual use thereof is with the permission of the named insured . . ..*"

■ Acting under a general execution issued on the aforesaid judgment, plaintiff initiated this garnishment proceeding against Farmers Mutual, as garnishee. Rule 90; Chapter 525. (All references to rules are to the Rules of Civil Procedure, V.A.M.R.; and all statutory references are to RSMo 1959, V.A.M.S.) The *sole issue* framed by plaintiff's denial of the garnishee's answers to interrogatories and by the garnishee's reply to said denial [Rule 90.18; Sec. 525.190; Rainwater v. Wallace, 351 Mo. 1044, 174 S.W.2d 835, 839(9); South Central Securities Co. v. Vernon, 227 Mo.App. 486, 54 S.W.2d 416, 421(1)] and presented in the jury-waived trial by the circuit court, was whether defendant Gloria was an "insured" within the contemplation and meaning of the omnibus clause of the policy or, as that issue is put plainly and precisely in plaintiff's-appellant's brief, whether defendant Gloria was, at the time of accident, using the Ford with the permission of Nancy W. Long, the "named insured" in the policy. The circuit court resolved that issue in the negative and thus in favor of garnishee. Upon this appeal by plaintiff, we have appellate jurisdiction because the amount in dispute, exclusive of costs, is $5,000 [Const. of 1945, Art. 5, Secs. 3 and 13, V.A.M.S.; Sec. 477.040], that being the maximum limit of garnishee's potential liability for bodily injury to one person.

Earl W. Long and Arlie James were cousins. Arlie and his family, including his daughter Gloria (defendant herein), resided in Mulberry, Kansas. For some two years after Earl W. and Nancy W. Long were married in 1950, they lived in Burgess, Missouri, just across the state line from Mulberry. When they moved from Burgess, the Longs settled in Kansas City, Missouri, and there lived as man and wife un-

til their separation in September 1958. On December 3, 1958, Nancy was granted a decree of divorce, custody of three minor children, and child support.

During October 1957, Nancy called one Garth Peck, an agent of Farmers Mutual, concerning insurance coverage on the Ford; and, in response to that call, Peck went to the Long home and, after some discussion, took from Nancy a signed application for issuance of a policy to her. The application stated that she would drive the insured automobile "100%" of the time; and, as we have noted, the policy subsequently was issued to her, as the sole "named insured." However, the fact that the application showed that Nancy was married and a "housewife" prompted the underwriting department of Farmers Mutual to obtain an independent report, which tended to explain, as well as confirm the truth of, the application in that it disclosed that Earl, then thirty-three years of age, did not drive and had "no apparent desire to do so although unimpaired and capable of learning." At the trial on December 28, 1961, Earl frankly stated that he did not drive in October 1957, when the policy was issued; and, although suggesting that he then (in 1957) was "just learning" to drive, he quickly conceded that, at the time of trial, he still had not taken the examination for a driver's license and did not have one.

About December 3, 1958, the date of entry of the decree of divorce, Earl and Nancy entered into an oral property settlement agreement. As Nancy stated it upon trial, "there were payments to be made on the household furnishings because they were mortgaged to buy the car and so we made an agreement between ourselves that I would keep the household furnishings and make the mortgage payments on them and he [Earl] would keep the car and make the payments on it." There was no dispute about the terms of this oral agreement, Earl confirming it in similar language. However, he did not take possession of the Ford when the agreement was reached or the decree of divorce was entered. Because he

had no place to park it at the location to which he moved, he told Nancy to keep the Ford at her home until he called for it. She did this, using it as she had previously. Several months later on a date not fixed precisely by the evidence but which Earl thought was around "the last of April or first of May" 1959, he called Nancy and asked that she bring the Ford to him by the following Friday evening. In compliance with this request, Nancy parked it in front of Earl's place of residence and left the keys with his landlady. In the interim between the date of entry of the decree of divorce and Earl's request for possession of the Ford, the policy had come up for renewal and Nancy, from her personal checking account, had paid the premium for the next six-month policy period from April 13 to October 13, 1959. Neither Earl nor Nancy executed the assignment on the reverse side of the certificate of title to the Ford (issued, as we have observed, to "Earl W. Long and/or Nancy Long, tenants by entirety"), which said certificate of title, at all times herein material, remained in the possession of a finance company.

Nancy stated that, when Earl called for the Ford, "he said he wanted to take it and keep it"—"he told me he was going to take it to Mulberry and have Arlie [James] do some work on it." Earl likewise testified that "I told her [Nancy] I was going to take it to Mulberry"—"I was going to have some work done on it" by Arlie James. A short time later, Earl thought "the weekend of Decoration Day" 1959, he took the Ford to Mulberry and left it with Arlie. As to the "arrangements" between Earl and Arlie at that time, Arlie said "there was a little agreement; he [Earl] brought it down and said he wanted to leave it and get it out of the city and he wanted me to do a little work on it for him . . . ." The Ford thereafter remained in Mulberry until the date of accident, to wit, July 30, 1959. On that date, Gloria James (then twenty-five days short of her nineteenth birthday) had intended to take her father's (Arlie's) automobile for a trip to Fort Scott; but "there

was something wrong with it," so Arlie directed Gloria (without any request on her part) to take the Ford.

As a prerequisite to their principal contention (i. e., that Gloria was, at the time of accident, using the Ford with Nancy's permission), plaintiff's counsel make the prefatory assertion that, since there had been no assignment of the certificate of title to the Ford, Nancy remained "a co-owner" of that vehicle after possession thereof had been delivered to Earl pursuant to the oral property settlement agreement, and that, as such "co-owner," Nancy had legal capacity and power to grant "permission" for use of the Ford, within the contemplation and meaning of the omnibus clause in the policy. Cf. Haynes v. Linder, Mo.App., 323 S.W.2d 505, 510(6).

■■ Actually, the effect of the divorce decree of December 3, 1958, upon the title to the Ford was to convert the tenancy by the entirety into a tenancy in common and to vest each of the divorced spouses with an undivided one-half interest in the Ford. Durr v. Vick, Mo., 345 S.W.2d 165, 169(4); Gardine v. Cottey, 360 Mo. 681, 230 S.W.2d 731, 738(5), 18 A.L.R.2d 1100; Mack v. Mack, Mo.App., 286 S.W.2d 385, 388(1). If (as is by no means clear from the record) the parties to the oral settlement agreement had undertaken thereby to convey legal title to the Ford to Earl, the agreement certainly would have been ineffectual to have accomplished ·that purpose. Sec. 301.210; Kelso v. Kelso, Mo., 306 S.W.2d 534, 538–539(5, 6), 71 A.L.R.2d 258; M.F.A. Cooperative Ass'n. of Mansfield v. Murray, Mo.App., 365 S.W.2d 279, 286, and cases cited in footnote 5. Nevertheless, it was competent for Earl and Nancy, as tenants in common, to agree that one of them should have sole or exclusive possession of the Ford [86 C.J.S. Tenancy in Common § 25, loc. cit. 384; Slade v. Louis Hornick Co., 189 Misc. 104, 71 N.Y.S.2d 302, 303(2); Stanley v. Cox, 253 N.C. 620, 117 S.E.2d 826, 836(11); Garrett v. McAtee, 195 Ark. 1123, 115 S.W.2d 1092]; and this they un-

doubtedly did. As we commented in Allstate Insurance Co. v. Hartford Acc. & Ind. Co., Mo.App., 311 S.W.2d 41, 47, "we have no doubt that in a proper transaction the legal title of a motor vehicle may be separated from the right of possession and, for that matter, the right of control of such vehicle."

■■ The general rule is that a tenant in common who has actual possession of indivisible personalty not susceptible of joint and equal possession may retain possession to the exclusion of his cotenant or cotenants. 14 Am.Jur., Cotenancy, § 23, loc. cit. 94; id., § 24, p. 95. See McNabb v. Payne, Mo. App., 280 S.W.2d 864, 866(1); McDowell v. Hollingsworth, Mo.App., 10 S.W.2d 314, 315(1); Farmers' Sav. Bank v. American Trust Co., Mo.App., 196 S.W. 35, 37(4); 77 C.J.S. Replevin § 49, p. 34. Accordingly, since "permission" generally "carries with it the necessary aspect of the right, power, or privilege to give or to withhold the grant of license embodied in the term" [Allstate Insurance Co., supra, 311 S.W.2d loc. cit. 45, and cases cited in footnote 1], we are inclined to agree with counsel for instant garnishee that, after the Ford was delivered into the sole and (as against Nancy) exclusive possession of Earl pursuant to the oral property settlement agreement, Nancy would have had no legal right or power to have granted to others "permission" to use the Ford.

■■ However, we need not and do not rest our disposition of the appeal on that premise. For, if it be conceded (for the purposes of this opinion) that Nancy still had the right and power to grant "permission" (within the contemplation and meaning of the omnibus clause) for use of the Ford after Earl had taken sole and exclusive possession of it, we are satisfied that the record before us reasonably permitted and justified the conclusion of the trial court that there was no grant of permission by Nancy to defendant Gloria. We recognize that, as counsel for instant plaintiff emphasize, the permission contemplated

by the omnibus clause may be either express or implied from the conduct of the person (or persons) having the right and power to grant such permission. Varble v. Stanley, Mo.App., 306 S.W.2d 662, 666 (4); Haynes, supra, 323 S.W.2d loc. cit. 510 (8); M.F.A. Mutual Ins. Co. v. Alexander, Mo.App., 361 S.W.2d 171, 179, 180. But we must bear in mind also that "the permission contemplated is something more than mere sufferance or tolerance without taking steps to prevent" [Haynes, supra, 323 S.W.2d loc. cit. 510(8); M.F.A. Mutual Ins. Co., supra, 361 S.W.2d loc. cit. 179, 180], and that "no implied permission can arise merely because someone obtained possession of the property and used it without the knowledge of the named insured." Varble, supra, 306 S.W.2d loc. cit. 666(5); M.F. A. Mutual Ins. Co., supra, 361 S.W.2d loc. cit. 179.

There is no contention that Nancy gave *express* permission to defendant Gloria to drive the Ford, but plaintiff's position is that a case of *implied* permission was made "initially through the unrestricted and unqualified delivery of the automobile to Earl Long to be taken to Burgess, Missouri, and to be used by the James family and subsequently through Nancy Long's knowledge for over two months of the fact of the automobile being at Burgess, Missouri, and being used by the James family coupled with the social relationship between the parties and the fact of no objection to its continued use by the James family." However, there was no evidence that, when Nancy delivered the Ford to Earl, she was informed, or had any reason to believe, that it was "to be used by the James family." On the contrary, the record is clear that Earl then said no more than that he intended to take the Ford to Mulberry to "have Arlie [James] do some work on it." And the evidence falls far short of showing satisfactorily and convincingly that Nancy thereafter knew, or had reason to believe, at any time prior to the accident of July 30, 1959, that the Ford was "being used by the James family."

In fact, the trial court reasonably could have found that defendant Gloria had never driven the Ford prior to the ill-fated journey of July 30. For, although Gloria's father, Arlie, a willing witness for plaintiff in this proceeding, testified that Earl actually had seen Gloria driving the Ford prior to July 30, and although Earl, likewise a witness for plaintiff, thought that Gloria "once or twice before" had driven the Ford "a short distance," the inescapable import of the testimony of defendant Gloria, who certainly should have been knowledgeable on this subject, was that she had never driven the Ford prior to July 30. This was her testimony: "Q. Had you operated this automobile on other occasions, other than on the date of this accident? A. Not that I can recall, no. Q. You might have operated this automobile? A. I don't believe so." Arlie owned an automobile which apparently was used by members of his family, including Gloria; and, as Gloria disclosed, but for the fateful circumstance that "there was something wrong with it" the morning of July 30, she would have been driving her father's automobile, and not the Ford, when the crash occurred.

We have not overlooked *Arlie's* testimony that, when the Ford was left with him, Earl said to "drive it just like it was my own; he . . . didn't care who drove it just as long as they was [sic] licensed operators" and "in the family," and *Earl's* testimony that "he [Arlie] just asked if it would be all right if *they* used it and I said 'yes' "—"I didn't have any particular one in mind, I mean, just any of them I thought was all right." But, in determination of the instant proceeding, it is not material or significant whether *Earl* granted permission, express or implied, to defendant Gloria for use of the Ford. This, because *Earl was not a named insured in the policy;* and, for defendant Gloria to have been an "insured" under the policy, it was essential for her use of the automobile to have been "with the permission of the named insured," i. e., *Nancy.*

Nor have we overlooked this testimony by Earl, to which plaintiff's counsel attach importance: "Q. . . . [d]id you tell her [Nancy] during that period of time [i. e., in the interim from delivery of the Ford into Earl's possession to July 30] where the car was? A. Yes, I had told her. Q. And who was driving it? A. Yes." We are unwilling to read into the generalized language of the latter question (put by plaintiff's counsel on direct examination) and the simple affirmance of the answer the implication that Earl had told Nancy that members of Arlie's family, including defendant Gloria, were driving the Ford; and this is particularly so when Gloria herself testified that she had not driven the Ford prior to July 30, and when there was absolutely no evidence that any member of Arlie's family, other than Arlie himself, had driven that vehicle. Furthermore, the gist of Nancy's testimony on this subject was that she had had no knowledge that defendant Gloria had driven the Ford, until Gloria's mother had informed her (Nancy) of the accident. So, in any event, Earl's quoted testimony could have done no more than to have raised an issue of fact as to Nancy's knowledge vel non, prior to July 30, of defendant Gloria's use of the Ford, which issue reasonably might have been resolved in the negative and thus against plaintiff.

In urging "the social relationship between the parties" as a factor tending to support their theory of implied permission, plaintiff's counsel refer to the fact that, while Earl and Nancy were married, they visited from time to time in the James home and, in turn, were visited by members of the James family. But, certainly no significance can be accorded to this when it stands uncontradicted in the record that there had been no contact whatever between Nancy and the James family, who were her husband's relatives, for about one year prior to the date of accident, and that Arlie admittedly knew, when the Ford was left with him, that Earl and Nancy had been divorced.

Plaintiff's counsel lean heavily upon Haynes v. Linder, Mo.App., 323 S.W.2d 505; but they overlook the basic and distinguishing fact that, in the language of that opinion, *"under the undisputed facts it appears that* [defendant] *Linder's possession of and right to drive the* [insured] *automobile . . . was by and with the consent of Bacus* [the owner of the automobile and the named insured in the policy covering it], *who we hold had the power to consent and who having been advised that Linder was driving the car, acquiesced and agreed that Linder could continue to drive the car."* [323 S.W.2d loc. cit. 512] It should be noted also that the case at bar is *not* one in which permission to use the insured automobile, *at least for a certain purpose,* had been granted by the owner and named insured to the operator at the time of accident, and in which the determinative dispute was as to the *extent of use* contemplated and permitted. Contrast Winterton v. Van Zandt, Mo., 351 S.W.2d 696.

■ Although, in this court-tried case, we "review the case upon both the law and the evidence as in suits of an equitable nature" [Rule 73.01(d); Sec. 510.310 (4)], the same antecedent statute and superseding rule direct that "[t]he judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." We find the conclusion inescapable that the trial court reasonably could have found, as it did specifically, that Nancy, the named insured, "did not, expressly or impliedly, permit defendant, Gloria James, to use the [Ford] automobile." Accordingly, it becomes our plain duty to affirm the judgment for garnishee. It is so ordered.

RUARK, P. J., and HOGAN, J., concur.