GOVERNMENT EMPLOYEES INSURANCE COMPANY, a Corporation, Plaintiff-Appellant,

v.

Robert LAMMERT et al., Defendants-Respondents.

No. 34214.

Missouri Court of Appeals, St. Louis District.

April 25, 1972.

Motions to Transfer to Supreme Court Denied June 28, 1972.

Application to Transfer Denied Sept. 11, 1972.

---

Morris, Wuestling & James, William F. James, St. Louis, for plaintiff-appellant.

Wiley, Craig, Armbruster & Wilburn, Earl B. Wilburn, Robert C. Ely, Armstrong, Teasdale, Kramer & Vaughan, Frank N. Gundlach, John J. Cole, St. Louis, for defendants-respondents.

DOERNER, Commissioner.

Plaintiff insurer sought a declaratory judgment decreeing that the policy of liability insurance it had issued to Charles M. Kollmeyer, its named insured, did not cover the liability of defendant Lammert who was driving the Buick automobile of the named insured at the time that the accident occurred. The trial court held that Lammert was covered under the policy, and for reasons which will shortly appear entered a judgment against plaintiff and in favor of defendant Harry William Peterson for $5500.00, together with interest, on the latter's counterclaim. Its post-trial motions having been unavailing, plaintiff appealed.

At the inception of the trial all of the parties stipulated as follows:

"1. That at all pertinent times mentioned in evidence plaintiff Government Employees Insurance Company is and was a lawfully organized corporation authorized to do business in the State of Missouri and as such is and was licensed and authorized to engage in the general insurance business in the State of Missouri (T. 31).

"2. On or about the first day of September, 1967, defendant Lammert was operating a 1962 Buick Two-Door Sedan bearing Engine Number 314–515996 and Missouri State License Number AE5–846. The titled owner to said automobile was Charles M. Kollmeyer (T. 31).

"3. That defendant Bergmeyer was a passenger in the aforesaid automobile operated by defendant Lammert and owned by Charles M. Kollmeyer.

"4. That on or about September 1, 1967, defendant Peterson was the operator of a 1963 Ford automobile and defendants Baumgart and Probst were passengers therein.

"5. That on or about September 1, 1967, defendant Mitchell was the operator of a Chevrolet automobile having as passengers therein defendant Sullivan and Catherine O'Connor and Marie Mitchell, now deceased.

"6. That on Friday, September 1, 1967, the aforesaid individuals and automobiles were involved in, or were at the scene of, an automobile accident at or near the intersection of Riverview Drive and Scranton, both open and public streets in the City of St. Louis, State of Missouri.

"7. That on or about September 1, 1967, plaintiff Government Employees Insurance Company, a Corporation, had

in full force and effect a policy of liability insurance, Policy Number 1189202, listing Charles M. Kollmeyer as the named insured and purporting to insure one 1962 Buick Two (2) Door Sedan.

"8. That all of the aforesaid individuals, all defendants herein, may have received serious and/or permanent injuries as the result of this collision.

"9. That as the result of the aforesaid collision a lawsuit was filed in the Circuit Court of the City of St. Louis, State of Missouri, styled William Mitchell, plaintiff, vs. Harry Peterson, Jr. and Robert Lammert, defendants, said lawsuit being Cause Number 93655–E, wherein plaintiff William Mitchell sought a money judgment against defendants, Harry Peterson, Jr. and Robert Lammert, for alleged injuries to himself and money damages for the death of his wife, Marie Mitchell.

"10. That on October 9, 1968, judgment was taken in the aforesaid Cause Number 93655–E in favor of William Mitchell and against Harry Peterson, Jr. and Robert Lammert in the aggregate amount of Eleven Thousand ($11,000.-00) Dollars and costs and, further, on said date that judgment was satisfied in total by Harry Peterson, Jr., by payment of the sum of Eleven Thousand ($11,000.-00) Dollars to William Mitchell.

"11. That defendant Robert Lammert claims he is an insured under the above indicated policy of liability insurance issued by plaintiff Government Employees Insurance Company and demands full coverage and protection as an insured thereunder; however, plaintiff states that under its policy of liability insurance, as aforesaid, no coverage is or was afforded to defendant Robert Lammert.

"12. That on or about November 12, 1968, defendant Harry Peterson, Jr., notified plaintiff that the aforesaid judgment in the amount of Eleven Thousand ($11,000.00) Dollars had been entered against Harry Peterson, Jr. and Robert Lammert, that said sum had been paid on behalf of Harry Peterson, Jr., that Harry Peterson, Jr., by and through his next friend, Dorothy Peterson, pursuant to Section 537.060 of the Revised Statutes of Missouri, demanded contribution in the sum of Five Thousand Five Hundred ($5,500.00) Dollars of said judgment from Appellant, Government Employees Insurance Company, due to its alleged coverage and protection extended to its alleged insured, Respondent Robert Lammert, arising out of the aforesaid accident. However, to date, plaintiff, Government Employees Insurance Company, has failed and refused to make such contribution.

"13. The issue to be determined by the Court is whether or not the policy of liability insurance issued by the plaintiff, as aforesaid, did cover defendant Robert Lammert at the time of the aforesaid collision."

In addition to listing Charles M. Kollmeyer as the "named insured," as stipulated, the policy introduced into evidence also provided that that term " * * * also includes his spouse, if a resident of the same household." As to liability coverage (Part I) the provision regarding "persons insured" read:

"Persons Insured: The following are insureds under Part I:

(a) with respect to the owned automobile,

(1) the named insured and any resident of the same household,

(2) any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, and

(3) any other person or organization but only with respect to his or its lia-

bility because of acts or omissions of an insured under (a) (1) or (2) above;"

Kollmeyer, called as a witness by plaintiff, testified that he had never given Lammert permission to operate his automobile, and Lammert, who appeared for defendants, agreed and admitted that he had never been given such permission by Kollmeyer. The basis upon which the court held that the policy covered Lammert, as stated in its conclusions of law, was that "1. Michael Kollmeyer, (the son of Charles Kollmeyer) because of the control he was permitted to and did exercise over the 1962 Buick Skylark and the other facts in evidence, had implied authority from the named insured to authorize other persons to use the vehicle. 2. On September 1, 1967, Michael Kollmeyer gave Robert Lammert permission to use the 1962 Buick Skylark, and it was being driven by Robert Lammert pursuant to that permission at the time and place of the accident."

■ There was a direct conflict in the evidence as to whether Michael had given Lammert permission to use the car, and we are not impressed by the testimony of the defendants on that issue. But reluctantly bowing to the rule of deference where the evidence was conflicting in a court tried case we will assume that Michael gave Lammert permission to use the car, as the trial court found. However, under the foregoing provision of the policy Michael's grant of permission to Lammert did not make the latter an insured unless the evidence also showed that Michael had been given the authority by Kollmeyer, the named insured, expressly or impliedly, to grant such permission to Lammert. As was said in Haynes v. Linder, Mo.App., 323 S.W.2d 505, 510:

"It is the general rule that one to whom the insured has given permission to use the automobile has no authority to delegate or grant such permission to another so as to make the latter an additional insured, but the insured's conduct, or the nature and scope of the permission grant-ed by him may be such as to indicate permission to such other, or to authorize the first permittee in turn to permit such other to use the automobile so as to bring the second permittee within the coverage of the policy. * * *"

Whatever may be the law in some other states, our appellate courts have consistently and uniformly followed that rule. St. Paul Ins. Co. v. Carlyle, Mo.App., 428 S. W.2d 753; Helmkamp v. American Family Mut. Ins. Co., Mo.App., 407 S.W.2d 559; Nye v. James, Mo.App., 373 S.W.2d 655; M. F. A. Mut. Ins. Co. v. Alexander, Mo. App., 361 S.W.2d 171; M. F. A. Ins. Co. v. Lawson, Mo.App., 336 S.W.2d 123.

■ The evidence in this case, in our opinion, fell far short of showing that Kollmeyer had given Michael such unfettered and unrestricted control over the car that Michael was impliedly authorized to grant permission to Lammert to use the car. Michael, in his senior year in high school, was employed at the Gem Store, located approximately two miles from his home. He wanted a car to be used in going to work and back with the permission of his parents, and spotted an ad for a car which interested him. Michael, with his father and mother, went to the dealer and the car was purchased. Michael put up $400.00 of his own money and borrowed the remainder, $500.-00, from his mother on his promise to pay her back. Since Michael was a minor the dealer would not sell the car to him, and the bill of sale was made out to Kollmeyer, and the title issued in his name. Kollmeyer applied for the policy in question, and in his application therefor stated that Michael would drive the car part of the time. With the policy Kollmeyer also received from the plaintiff insurer a letter, and Kollmeyer thereupon showed both the policy and the letter to Michael. The letter, which we rule was relevant and admissible, read:

"POLICY #118–92–02

"Dear Policyholder:

"GEICO is glad to welcome your teenage to our Automobile Insurance Family.

"The privilege of driving an automobile is a reward given by parents who have confidence in the responsibility to be assumed by their children. It is our belief that most youngsters will develop the driving skills and qualities which are so necessary to cope with the challenge presented by our congested traffic conditions and powerful automobiles.

"Nevertheless, our newspapers each day cary tragic stories of young people involved in fatal and near-fatal accidents. To improve your child's chances of not being involved in a serious accident, the following suggestions are offered:

"CONTROL USE by restricting the youngster's driving to certain times, places and weather conditions. Serious accidents are more likely late at night when visibility is poor, at other times when weather conditions are adverse, and where traffic is congested.

"STRICTLY PROHIBIT fellow students of your youngster from driving your automobile.

"Studies indicate that as a young person spends more time with an automobile, grades in school tend to slip. One comprehensive study indicated that more than 20 times as many 'F' students drive every evening per week as compared to 'A' students who are not permitted unrestricted use of the automobile during school nights. *Controlled Use* of the automobile will in many cases prevent deterioration of school grades.

"We recommend that you discuss this letter with your son or daughter.

"Your assistance and encouragement in stressing the importance of a mature attitude, adherence to traffic laws, and consideration for the other driver will help make your youngster a safe driver.

"Very truly yours,

"/s/ W. R. Hanson

"Underwriting Department"

Kollmeyer frankly stated that he had never specifically told Michael not to let anyone else drive the car, but both he and Michael testified that he had told Michael that the latter did not have a chauffeur's license and that he did not want Michael to haul others around in the car.

While Michael had one set of keys and Kollmeyer another, the uncontradicted evidence was that Michael was required to, and did, inform Kollmeyer, or in his absence Mrs. Kollmeyer, when he wanted to use the car. Michael did not drive the car back and forth to school, nor did he ever use it for social purposes except for one possible occasion (the evidence as to it is not clear), when he may have been permitted to use it to attend an event at his high school. The only other use than that of driving to and from work were two or three sporadic occasions when he went to a store for his mother.

The uncontradicted evidence also showed that the only persons, other than Michael, who ever drove the car were Thomas, Michael's older brother; Kollmeyer; Bruce, Michael's cousin; and Lammert. Thomas' use was limited to one occasion, when he picked up the car at the dealers and drove it home for Michael. Kollmeyer said that during the three months from the time it was purchased until the accident he used it once to go to work in and two or three times to go to a store. Mrs. Kollmeyer only drove the car to move it out of the driveway, to clear the path for her car. Michael's brief reference to the car having been driven by Bruce, his cousin, was not developed on either direct or cross-examination, but in any event Kollmeyer testified that he had no knowledge of its use by Bruce and there was no evidence to the contrary.

As to Lammert, in addition to testifying that he had not given Lammert permission to drive the Buick, Kollmeyer stated that he wouldn't know Lammert if he saw him, and that while Lammert may have, with his father, come to the Kollmeyer home on one occasion to look at a stereo he was not sure

whether it was before or after the day of the accident. Lammert did not go to school with Michael, and Michael first met Lammert at the Gem Store, about three months before the accident, when Michael started to work in the back of the store with Lammert. The extent of any socializing, according to Michael, consisted of going to a golf driving range once or twice. On the first day Michael drove the Buick to work, in June, Lammert asked Michael to let him drive the car around the Gem parking lot and Michael permitted Lammert to do so, with Michael in the automobile, at the conclusion of which Lammert told Michael the car needed a muffler and things. About two or three weeks later, at the end of their day's work, Lammert again asked Michael to drive the Buick around the parking lot but Michael said no. At the time Michael was in the car with the motor running, and Lammert managed to get in and started to drive. Michael grabbed the keys, but apparently removed them in such a way that their removal did not turn off the ignition, and Lammert drove the car on the parking lot the length of the store and back.

Pressed on cross-examination about the foregoing incident Lammert initially denied that he had driven the car against Michael's instructions, but finally took refuge in the statement, "I don't believe, I don't remember if I did." During his direct examination Lammert related that one night, in August, 1967, about a month before the accident, when he was working but Michael was not, Michael came to the store and asked Lammert to let him use Lammert's car to go to the Rosary High School, and Lammert permitted Michael to do so. According to Lammert, Michael had his own car with him that night and he told Lammert that if he was not back by a certain time Lammert was to drive Michael's car and meet him somewhere. Lammert stated that Michael told him at the time that if he ever wanted to use Michael's car in the future he could do so. Michael did return Lammert's car before Lammert got off from work, according to Lammert, and hence he did not drive Michael's car on that occasion.

Michael's testimony was in the form of a deposition taken on April 5, 1969, and introduced at the trial, held on October 27, 1969. Michael was not called as a rebuttal witness to refute Lammert's testimony as to the claimed blank-check permission Lammert claimed he had received from Michael and the trial court made a point of referring to the incident in his findings of fact. Bluntly put, Lammert's testimony regarding his receipt of the blank-check permission from Michael strains our credulity. Lammert stated that Michael was off work that night, and had driven his own car to the Gem Store, where he borrowed Lammert's to go to the high school; but Lammert offered no explanation as to why Michael, then in possession of the Buick, could not have driven his own car directly to the high school, or why it was necessary for Michael to drive to the store to leave his own car and borrow Lammert's. In any event, as we have previously pointed out, it is not material or significant whether Michael granted Lammert such claimed blank-check permission to use the Buick, for the reason that Michael was not a named insured in the policy. Nye v. James, Mo.App., 373 S.W.2d 655, 660.

Apparently realizing the obvious weakness of their evidence that by his conduct Kollmeyer had impliedly clothed Michael with authority to grant Lammert permission to use the car and thus become an insured, on oral argument defendant's counsel argued that Kollmeyer had in effect granted Michael such authority merely because he had not specifically and explicity forbidden Michael to loan the car to anyone else. While novel, such a contention is untenable, as amply demonstrated by the cases heretofore cited.

The judgment is reversed and the cause remanded with directions to enter a judgment for plaintiff declaring that the policy of liability insurance issued by plaintiff to Kollmeyer did not cover defendant Robert Lammert as an insured for any lia-

bility heretofore, or hereafter, asserted against Lammert arising out of his accident of September 1, 1967; and in favor of plaintiff, and against defendant Harry William Peterson, on the latter's counterclaim.

PER CURIAM:

The foregoing opinion by DOERNER, C., is adopted as the opinion of this Court. Accordingly, judgment reversed and cause remanded with directions.

BRADY, C. J., and DOWD, SMITH, SIMEONE, and WEIER, JJ., concur.