### EASTLAND OIL CO. et al. v. FENOGLIO.

#### No. 13502.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 12, 1937.

Rehearing Denied March 12, 1937.

Joe F. Orr and Hampden Spiller, both of Fort Worth, and Butts & Wright, of Cisco, for appellants.

Slay & Simon, of Fort Worth, for appellee.

DUNKLIN, Chief Justice.

B. P. Fenoglio instituted a former suit in the district court of Ward county, Tex., against The Eastland Oil Company, W. J. Armstrong, L. H. Choate, and others to recover an interest in an oil lease on one-fourth of a section of land in that county, the legal title to which stood in the name of defendants. Mrs. Fay Fenoglio, wife of plaintiff, was an intervener.

On February 14, 1935, a compromise was made between the parties and entered as a judgment in the case, by the terms of which plaintiff and intervener relinquished all of their asserted rights in the lease, and the case was dismissed. The recited consideration for such compromise was a payment by the defendants to the plaintiff of the sum of $10 in cash and "other valuable consideration," and the sum of $1,000 cash was then paid to Fenoglio. On the same day the Eastland Oil Company, acting by and through its president, Geo. A. Donnelly, and W. J. Armstrong, executed a written agreement with Harry E. Gerke, by the terms of which Gerke was given the option to purchase one-half of the southeast quarter of section 4, block 34, H. & T. C. Railway Survey in Ward county, the same being half of the oil lease involved in the former suit and on which there were three producing oil wells, for a cash consideration of $70,000 to the grantors, conditioned upon the deposit by Gerke or his assignee, of that sum of money in the Continental National Bank of Fort Worth, Tex., in escrow, to be paid over to the grantors upon a consummation of the sale; the deposit to be made within seven days after the date of the instrument, with the further stipulation that, if the deposit was not so made within that period of time, then the bank was to return the option agreement to its makers, and to be of no further force or effect.

There was a further stipulation that, if the deposit was made within the time prescribed, then the makers would execute an assignment of the lease in favor of Gerke or his assignee, and the bank would deliver the same to such purchaser, together with the option agreement.

The option agreement contained a stipulation that the same would be subject to "the original agreement of the Sun Oil Company to make such assignment," with this further stipulation: "It is understood that there are certain other personal properties located on said lease belonging to First Parties and not used in the producing of said oil wells, among which is a drilling machine and a tractor, and that none of said personal properties are to be transferred to Second Party except the personal properties used in the production and operation of said wells."

On the same day that option was given, to wit, February 14, 1935, Gerke wrote the following letter:

"February 14, 1935.

"Mr. B. P. Fenoglio,
"Mr. L. H. Choate,
"Fort Worth, Texas.
"Gentlemen:

"I have secured an option for the sale of an oil producing property belonging to the Eastland Oil Company and W. J. Armstrong covering the south half (s½) of the west quarter (W¼) of Section 4, Block 34, H. & T. C. Ry. Company Survey, Ward County, Texas, at a price of $70,000.00. I will endeavor to consummate a trade for this property and it is agreed that any profits made over and above the purchase price of $70,000.00 will be shared alike between the three of us.

"It is further agreed and understood that we will advise with each other and work together in the sale of this property with any prospective purchaser.

"This agreement shall be binding only for a duration of the option agreement.

"Yours very truly,

"H. E. Gerke."

The record shows that L. H. Choate held title to an interest in the lease, although the same did not appear of record.

During the life of that option Gerke and Fenoglio attempted to sell the property to Roy A. Westbrook, but their efforts were unsuccessful and the option given expired by virtue of its own terms.

On March 1, 1935, Roy Westbrook wrote the following letter:

"Fort Worth, Texas. March 1, 1935.
"Mr. B. P. Fenoglio,
"Fort Worth, Texas.
"Dear Sir:

"It is my understanding that you are offering for sale the oil and gas leasehold estate covering certain lands in Ward County, Texas, said land being known as the South half of the Southwest quarter of Section 4, Block 34, H. & T. C. Railway Company Survey, sometimes known as the South half of the West quarter of said

section, the West corner of the quarter section thereby described being the common corner of Sections 5, 19 and 11, all in Block 34, H. & T. C. Railway Company Survey, said lease being now owned and operated by the Eastland Oil Company and W. J. Armstrong.

"In answer to your officer, I agree to purchase said oil and gas leasehold for a cash consideration of $72,000. The closing of said purchase and the payment of the purchase price being subject to the following: ·

"1. Assignments and contracts necessary to cover title to said property to me are to be prepared and placed in escrow with the First National Bank of Fort Worth, Texas, before the close of banking hours on Monday, March 4, 1935.

"2. Simultaneously with the deposit in escrow of said conveyances, I will deposit with said named bank certified check in the sum of $72,000.

"3. You agree to submit to me on or before Monday, March 11, 1935, complete abstract certified to date covering this property prepared by a reputable abstracter of Ward County, and I am to have seven days in which to have the same examined by my attorneys and submit written opinion of title to you. You are to have seven days thereafter in which to meet such requirements as are needed, at the end of which time if such requirements are not met, I am to have the option of waiving such title defects and making payment for said property.

"When title to said property has been approved by me or my attorneys, the above named bank is to deliver to me assignments covering said property and is to deliver to the Eastland Oil Company and W. J. Armstrong the agreed purchase price placed in escrow with it, save and except there is to be delivered to you by said bank the sum of $2,000 to be deducted from said agreed purchase price. It is further understood that the conveyance to me is to cover said oil and gas leasehold estate subject to the over-riding royalty now owned by the Sun Oil Company and is also to cover and include all personal property situated thereon or used in connection therewith, together with all materials and equipment employed on said lease in the production of oil and the operation of said property."

Following are two telegrams which passed between W. J. Armstrong and Fenoglio:

"DL 55 DL Ft Worth, Texas. 2:12:05 P March 2, 1935 12:30

"W. J. Armstrong. In accordance with agreement made for sale of producing property Kate Green lease, Ward County, Texas, am ready and able to complete deal by placing consideration in escrow together with your assignments conveying title; the purchaser is Roy A. Westbrook. I request you perform agreement immediately and deliver property and advise me by return wire at 603 Trinity Life Building, and we will complete transaction today.

"B. P. Fenoglio."

"DA 93 81 DL Cisco, Tex 4 903A Mar 4, 1935 AM 9 33

"B. P. Fenoglio, 603 Trinity Life Bldg., Ft. W.

"If money was placed in escrow Saturday as agreed by you have bank wire First National Bank, Cisco, and I will deliver assignment to bank here today; I agreed to deliver an assignment for an undivided one-quarter interest for eighteen thousand dollars if you have complied with your agreement and money was deposited I am ready to go ahead with deal. It is understood that any transfer must be approved by the Eastland Oil Co. and the Sun Oil Co.

"W. J. Armstrong."

The case was tried to a jury, and following are special issues submitted, with findings thereon:

"1. Do you find from a preponderance of the evidence that prior to March 1, 1935, the Eastland Oil Company, through its agent, George Donnelly, orally agreed with the plaintiff, B. P. Fenoglio, that he might procure a purchaser for the property in question for the sum of $70,000.00? Answer: Yes.

"2. Do you find from a preponderance of the evidence that prior to March 1, 1935, the defendant L. H. Choate orally agreed with the plaintiff, B. P. Fenoglio, that he might procure a purchaser for the property in question for the sum of $70,000.00? Answer: Yes.

"3. Do you find from a preponderance of the evidence that prior to March 1, 1935, the defendant W. J. Armstrong orally

agreed with the plaintiff, B. P. Fenoglio, that he might procure a purchaser for the property in question for the sum of $70,000.00? Answer: Yes.

"4. Do you find from a preponderance of the evidence that prior to the procuring by the plaintiff Fenoglio of a purchaser of the property in question on the basis of $70,000.00 that the Eastland Oil Company, through its agents, George Donnelly, withdrew its verbal contract, if any such oral agreement you have found as inquired about in special issue No. 1 above? Answer: No.

"5. Do you find from a preponderance of the evidence that such oral agreements, if any you have found, as inquired about in issues Nos. 1, 2 and 3, were merged into the written option dated February 14, 1935? Answer: No.

"5-A. Do you find from a preponderance of the evidence that the written option, dated February 14, 1935, was made in the name of the witness Gerke for the use and benefit of the plaintiff, B. P. Fenoglio? Answer: No.

"5-B. Do you find from a preponderance of the evidence that the plaintiff B. P. Fenoglio accepted an assignment of an interest in the written option contract of February 14, 1935? Answer: Yes.

"6. Do you find from a preponderance of the evidence that the written option, dated February 14, 1935, was a part of the consideration to the plaintiff B. P. Fenoglio for the dismissal of the lawsuit pending in Ward County? Answer: No.

"7. Do you find from a preponderance of the evidence that at the time the purchaser of said property was procured by the plaintiff, B. P. Fenoglio, that the said plaintiff Fenoglio was operating solely under the written option under date of February 14, 1935? Answer: No.

"8. Do you find from a preponderance of the evidence that at the time the purchaser of said property was procured by the plaintiff B. P. Fenoglio that the said plaintiff Fenoglio was operating under the oral contracts made by the defendants, if any you have found were so made, as inquired about in special issues Nos. 1, 2 and 3, above? Answer: Yes."

The court overruled motions of all defendants for judgment notwithstanding the verdict and dismissed plaintiff's suit as against defendant Geo. Donnelly, individually, on plaintiff's nonsuit as against him, but awarded plaintiff a recovery against defendants Eastland Oil Company, W. J. Armstrong, and L. H. Choate, jointly and severally, for the sum of $4,500, with interest and costs of suit, from which those defendants have appealed.

In plaintiff's original petition, it was alleged that one of the inducements which caused him to dismiss his former suit, pending in the district court of Ward county, was the representation of defendants through their agent Harry E. Gerke that plaintiff would be given the authority to sell the lease in controversy for a net sum to defendants of $70,000 in cash, with right of plaintiff to receive any sum in excess of that price that might be realized from such sale.

In another count in his petition, it was alleged that, both before and after the compromise of his former suit in Ward county, the defendants listed the lease with him for sale at a cash price of $70,000, net to them, and with their agreement that, if plaintiff procured a purchaser for a price in excess of that sum, he should receive the amount of such excess as a broker's commission for his services. According to further allegations, he procured a purchaser in one Roy A. Westbrook, who was ready and willing to pay $80,000, but defendants rejected the offer and refused to consummate the sale, and therefore owed plaintiff $10,000 for which he sought a recovery.

In addition to numerous exceptions to plaintiff's pleadings and a general denial, defendants specially denied that they had ever listed the lease for sale with plaintiff either before or after February 14, 1935, and further that, if the same was so listed, such agency was abrogated with notice thereof to plaintiff before he ever procured any offer by Westbrook to buy.

It was further alleged that the option contract referred to above, of date February 14, 1935, was taken in the name of Harry E. Gerke as agent for and at the instance of plaintiff and for the joint benefit of both and defendant Choate as associates and partners in the undertaking to dispose of the lease; and, contemporaneously with the taking of the option, Gerke executed the agreement in writing, set out above, for a division between him and plaintiff and Choate of whatever profit might be realized under the option. And further that since no purchaser was found within the period fixed by the option contract,

plaintiff had failed to show a right to the commission sued for. There were further allegations that all agreements and representations made by defendants with plaintiff prior to February 14, 1935, were merged in the option agreement of that date.

In his supplemental petition plaintiff alleged that the listing of the lease with him for sale was a transaction separate and apart and independent of the option agreement to which plaintiff never agreed and his action in finding a purchaser for the property was under and by virtue of the listing of the property with him only and not under the option agreement.

 The contention presented in different propositions in appellants' briefs is that plaintiff's acceptance from Gerke of an interest in the option contract as found by the jury precluded his right of recovery on the alleged prior listing. Plaintiff admitted in his written depositions, taken before the trial, that he dictated the letter addressed to him by Gerke, agreeing that plaintiff and Choate and Gerke would cooperate to sell the lease under the option in Gerke's name, and that he tried to negotiate a sale under that option, yet he further testified on the stand that, after the option had expired and independently of its terms, defendants agreed that he might sell the lease for $70,000 cash net to him and have all over and above that price as a broker's commission for making the sale, and that, acting under that agreement, he procured a proposed purchaser in Roy A. Westbrook ready, willing, and able to pay $74,500, which offer defendants refused to accept. That testimony was sufficient to support the finding of the jury on that issue, even though it be said that the alleged oral agreement covering the same matters made before the date of the option was merged in the option by operation of law. In his pleading plaintiff did not rely on any extension of the option.

Furthermore, defendants did not except to the submission of issue No. 5 as to whether or not the prior oral listing of the lease with plaintiff for sale was merged in the written option thereafter given in the name of Gerke, although that issue embodied a mixed question of law and fact. Article 2185, Vernon's Tex. Civ. St. 1936.

 Defendant presented to the trial court separate and different exceptions to the submission of issues Nos. 1, 2, and 3. One of the exceptions was, in substance, that they do not confine the oral agreements therein mentioned to such as were made prior to February 14, 1935, the date of the compromise of the former suit, with an instruction that any such agreements made subsequent to that date could not be considered. By another objection the point was made that the oral agreements referred to in issues Nos. 1, 2, and 3 should be restricted to such as were made after February 14, 1935. Manifestly, those objections presented contentions directly conflicting with each other, and therefore there was no reversible error in overruling both, and, accordingly, assignments of error based on those objections to issues Nos. 1, 2, and 3 are overruled.

The evidence introduced was sufficient to support all the findings of the jury, and therefore all assignments based on the contention to the contrary are overruled.

 There is no merit in the further contention that there was a fatal variance between plaintiff's pleading and proof, in that it was alleged that plaintiff procured a purchaser in Westbrook for a price of $80,000, while the proof was that the price offered was $74,500, since the suit was not against Westbrook to recover on his contract but for breach of defendants' contract with plaintiff that he might have all over and above $70,000 realized from the sale to Westbrook. The fact that the damages proved for breach of defendants' contract were less than the amount sued for would not constitute a variance. Nor did defendants claim surprise by the offer of that proof of damages.

On hearing of defendants' motion for new trial one juror was introduced to support the allegation of misconduct of the jury. The report of the testimony covers several pages in the statement of facts, an extended recital of which would unduly prolong this opinion. We deem it sufficient to say that after duly considering it, it is our conclusion that there is no merit in the assignment based on that ground.

The finding by the trial court that plaintiff procured a purchaser of the property in Westbrook who was ready, willing, and able to pay therefor $74,500 was undisputed.

 The judgment rendered implies a further finding by the court that under the terms of defendants' contract of employ-

ment of plaintiff to find a purchaser for the property he was authorized to sell not only the lease but the personal property located thereon which Westbrook in his written offer stipulated must go with the lease and be a part of his purchase. Proof of that fact was one of the necessary elements of plaintiff's case, and a failure to discharge that burden would of itself be fatal to his suit, notwithstanding proof of other necessary facts.

By one assignment of error complaint is made of the refusal of appellant's motion for an instructed verdict in their favor for lack of competent evidence to establish that essential element of plaintiff's case.

In the first place, there were no allegations in plaintiff's pleadings that he was employed to sell any personal property located on the lease along with the lease itself. He simply alleged he was employed to sell the lease.

The statement of facts in the record is voluminous, consisting of some 478 pages, much of which we have read in addition to that pointed out in appellee's brief, having a bearing on this particular point. The letter by Westbrook to plaintiff was relied on to show he had procured a purchaser in Westbrook to buy the lease, but in that offer to purchase it was expressly stipulated that the conveyance to be made to him by defendants of the lease should "cover and include all personal property situated thereon or used in connection therewith, together with all materials and equipment employed on said lease in the production of oil and the operation of said property."

Plaintiff testified to the effect that, after the option had expired, defendant Armstrong told him to go ahead and sell the lease to Westbrook. Appellant cites the following testimony of plaintiff:

"Q. Now, when you had this discussion with Mr. Armstrong there in the hotel, was anything said at that time about the personal property that was to go in the event that it was sold? A. I believe that there was.

"Q. What do you now recall as having been said on that occasion, as to what personal property was to go? A. Well, sir, there was some discussion about the personal property that they had.

"Q. What statement did Mr. Armstrong make about that, and what was said? A. That there would be perhaps certain property that was being used in connection with the operation of the other lease, and of course, that should be removed, that that would not go with this property. I said, 'that is perfectly all right; it should not go with this property, if it is used in connection with developing other properties. The personal property won't go, if it is in connection with the operation of the other lease.'"

Appellee has cited no specific testimony to show that he was authorized to sell any of the personal property on the lease, but he cites testimony given by him as follows: "A. Mr. Donnelly said, 'you know,' he said, 'this contract that Gerke had is out.' I said, 'I have never seen it,' and I had not, and never saw it until the following day, as a matter of fact, and he said, 'but your deal, if Roy Westbrook wants to buy this property,' he said, 'you can go ahead,' and he said, 'I will deliver, and you can go right on with the deal, if it is a bona fide deal.' He said, 'that is the reason I am getting this information for you; you can go along as we agreed,' and he said, 'it is not necessary to have the deal completed today or tomorrow, if you will get us a contract that he will buy the property; that is all we want and we can work out the details.'"

Also the following testimony of Roy A. Westbrook: "A. So I asked Mr. Donnelly (President of the Eastland Oil Company) if the property was for sale, and if Barney (plaintiff) had the right to sell it, and he said that he had had an option but that it had expired, and there were several people interested in it, but if Barney had a bona fide deal on it, as far as he was concerned, he thought it would be all right."

It is to be noted that no executed oil and gas lease is before us for construction. The suit was for breach of defendants' contract of employment of plaintiff to find a purchaser for the lease, and the question now under discussion is, What was the understanding of the parties as to whether the lease intended was the lease only or the lease together with its appurtenances, such as equipments and supplies on hand for use in maintaining and operating the wells for production of oil? The contract of employment being in parol, the rule forbidding the introduction of parol testimony to change or add to the terms of a contract in writing has no application. And we have reached the conclusion that the implied finding of the trial court that under defendants' contract of employment plaintiff was authorized to procure a purchaser on

terms substantially the same as proposed in Westbrook's offer of March 1, 1935, was supported by sufficient facts and circumstances in the evidence adduced. We will note some of the cogent facts supporting that finding. It is manifest that Westbrook's offer of $74,500 for the lease on 80 acres of land was by reason of the three producing wells which he intended to begin operating immediately upon his purchase with the equipment then in use on the ground. It is also clear that defendants were fully aware of that understanding by Westbrook when they furnished him with detailed description of the wells and operating equipment, oil production of oil allowables, and gave him permission to go out to the lease and investigate for himself with a view to purchase, and after which Westbrook made the offer. The statement in his offer as to what personal property he would expect to be included in his purchase could be reasonably construed as meaning tools and other operating equipments only. Nor have appellants cited us to any evidence in the statement of facts that any personal effects of a different character were then situated on the lease.

■■■■■ Moreover, an oil and gas lease conveys an interest in the land, and it is construed according to the rules for construction of deeds of conveyances. 31 Tex. Jur. § 39, p. 74, and § 54, p. 613. And "the general rule is that a deed will pass whatever interest the grantor may have in the land unless words are used showing an intention to convey a less estate." 14 Tex. Jur. § 151, p. 930. It also passes all rights and easements appurtenant to the land. 14 Tex. Jur. § 242, p. 1036.

All assignments of error are overruled, and the judgment of the trial court is affirmed.

### On Motion for Rehearing.

In an extended motion for rehearing and additional written argument, appellants stress the contention that the evidence conclusively showed a withdrawal of the property from sale before Westbrook offered to purchase it. Following is the testimony chiefly relied on to support the argument: Testimony of Donnelly that his written offer to purchase, of date March 1st, was the only firm offer he ever made to buy, and his further testimony, which was corroborated by that of Gerke, that the day before plaintiff told him that he had that letter he (Donnelly) told Gerke he had changed his mind about selling the lease; and told plaintiff the same when the latter informed him of Westbrook's written offer, which testimony of Gerke was not specifically denied by plaintiff.

Appellants further insist that the evidence shows conclusively that Gerke and plaintiff were working together jointly to procure a purchaser for the lease and that therefore plaintiff was bound by the notice so given to Gerke as his authorized representative. However, according to testimony of plaintiff, corroborated to some extent by that of Gerke, he was working separately and independently of Gerke, who was not interested in any of the commissions sued for, and was therefore not authorized to bind him by such notice to Gerke of Donnelly's withdrawal of the property from the market. In this connection it is proper to note plaintiff's testimony to the effect that on February 21st, in compliance with a request from Westbrook for such information, Donnelly furnished the data with respect to the character and condition of the property pointed out in our original opinion. With the information so furnished and after examination of the property, Westbrook decided he could not pay $80,000 therefor, which he would have been willing to pay had the property been as represented, but would pay therefor $74,500, and on that occasion Donnelly made the statement to him, as pointed out in our original opinion, that plaintiff "could go ahead with the deal, if it was a bona fide deal," and that "it was not necessary to have the deal completed today or tomorrow, if you will get us a contract that he will buy the property; that is all we want and we can work out the details."

Plaintiff further testified that on Monday morning, February 25th, he called Donnelly over the telephone and "told him that I had called Mr. Westbrook, and that we were ready to close the transaction, and he said, 'that is fine.' I said, 'it may require an hour or so for me to get up there, but I will be up and I have already called Mr. Westbrook, and we are ready to contract and go into it. We had been ready for several days when I reached him."

"Q. What did he say? A. He said that was fine, that he was glad we got that over, and he was very much pleased with it. * * *

"Q. When was the next time that you had a conversation with him—Donnelly?

A. The next conversation was on Friday, the first.

"Q. The first day of March? A. Yes sir, I remember that well, because that was the day that I received my purchase letter from Mr. Westbrook."

He further testified that Westbrook's written offer to buy the property was delivered to him on the morning of the same day, which was Friday, and at the same time Westbrook agreed to pay to plaintiff $2,500 in addition to the $72,000 stipulated in the contract which plaintiff wished to have set aside for the benefit of his daughters. He further testified that:

"A. I called Mr. Donnelly and notified him, and that was the first time that I talked to him since Monday morning, when I made the appointment with Mr. Westbrook; that was my first conversation with Mr. Donnelly, and I explained to him that I had this purchase contract, and was ready to close the deal. 'Why,' he said, 'I have changed my mind.' I said, 'When did you change your mind?' He said, 'Well, I have just changed my mind.' And that was the extent of our conversation. * * *

"Q. Did you talk to Mr. Donnelly any more after that Friday night, after he had told you that he had changed his mind? A. Yes.

"Q. Where? A. I talked to him about ten days later.

"Q. At what place? A. In his office.

"Q. Who was present? A. Mr. Gerke and I am not sure whether Mr. O'Brien was there or not. He may have been.

"Q. What was your purpose up there; what were you doing there? A. To find out why he did not want to fulfill his agreement.

"Q. What did you say to him, and what did he say to you, if anything? A. I said, 'Why don't you want to deliver the properties?' He said, 'Well, I just changed my mind.' I said, 'Don't you think that I have acted in good faith and worked out this properly?' He said, 'Oh, yes, no doubt about that, but I just don't want to sell it now. I just changed my mind.' That was about the extent of our conversation. * * *

"Q. Now Mr. Fenoglio, then, as a matter of fact, Mr. Westbrook never did finally come to any agreement to purchase this property until he furnished you that purchase letter; that is correct, isn't it, on the final purchase price? A. No, sir; he would have purchased that property on the Monday previous to this date, if the property had checked as represented.

"Q. All right, but at any rate, he said he had to check those properties, and you testified awhile ago that he phoned you from out there, or you phoned him, and that he said the purchase price would be reduced because there was a liner gone from the well. A. Yes, sir.

"Q. And when he finally came into contract, and made the agreement with you, that was this contract here? A. In addition to the $2,500."

Plaintiff further testified that during that week defendant Armstrong consented and agreed that he might go on with the deal with Westbrook then under negotiations.

Notwithstanding plaintiff's failure to specifically deny Gerke's testimony that either on Thursday night, February 28th, or on the morning of March 1st, he informed plaintiff of Donnelly's statement that he had changed his mind about selling the property, it did not follow that such information would preclude plaintiff's right of recovery upon the theory that the property was withdrawn from the market before plaintiff procured, in Westbrook, a purchaser ready, willing, and able to buy.

The defendants' pleading that the property was withdrawn from the market before plaintiff found a purchaser was as follows: "If any such agreement or listing was or had been made, there was no time limit set for the continuance of such agency and defendants would and did have a right to withdraw from any such contract or agreement at any time prior to the actual consummation of any sale, and in this connection defendants would show the Court that after the termination of said option contract below mentioned and before plaintiff ever consummated said purported sale, plaintiff was duly notified and informed by defendants that said properties were no longer for sale and therefore if there was or had been any such listing or agency created as alleged by plaintiff, it was and would have been duly terminated, as above shown, without any liability to plaintiff."

That pleading included no allegation that at the time of the attempted withdrawal of the property from the market plaintiff already had had a reasonable time within

which to find a purchaser and that the withdrawal of it was done in good faith.

In the absence of a time limit within which he was authorized to sell, plaintiff was entitled to a reasonable time within which to conclude his negotiations then in progress. 7 Tex. Jur. pp. 421-427, inclusive, and decisions there cited; 4 R. C.L. § 9, p. 263; 7 Tex.Jur. § 58, p. 449; Hamburger & Dreyling v. Thomas, 103 Tex. 280, 126 S.W. 561; Pahl v. Hansen (Tex.Civ.App.) 6 S.W.(2d) 818; 2 Tex. Jur. § 211, p. 629, § 212, p. 631.

Whether or not the property was withdrawn from the market before Westbrook's offer to buy was a special defense, and the burden was upon the defendants to sustain the affirmative of that issue by proper pleadings and proof. Defendants did not request, nor did the court submit, issues as to whether or not the attempted withdrawal was after plaintiff had had a reasonable length of time within which to conclude the negotiations already in progress, or whether or not the attempted withdrawal was in good faith. Those issues were incidental to the issue of withdrawal pleaded, and the testimony pointed out above was sufficient to support implied findings by the trial court that plaintiff procured a purchaser in Westbrook within a reasonable time after he was authorized so to do, and that the defendants' refusal to consummate the sale in accordance with Westbrook's written offer was arbitrary and prompted by their decision that the property was worth more than the price offered. And in this connection it is to be noted that defendants still own the property. Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084.

The motion for rehearing is overruled.