Patricia Ann HELMKAMP, a Minor, by Ivan Helmkamp, Guardian and Curator, Plaintiff-Appellant,

v.

The AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a corporation, Western Fire Insurance Company, a corporation, and Karen Sue Fleming, a Minor, Defendants-Respondents.

Patricia Ann HELMKAMP, a Minor, by Ivan Helmkamp, Guardian and Curator, Plaintiff-Respondent,

v.

The AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a corporation, Western Fire Insurance Company, a corporation, Defendants-Respondents,

Karen Sue Fleming, a Minor, Defendant-Appellant.

Nos. 8553, 8554.

Springfield Court of Appeals.

Missouri.

Oct. 3, 1966.

Karl W. Blanchard, Seiler, Blanchard & Van Fleet, Joplin, for plaintiff-appellant, Patricia Ann Helmkamp.

B. H. Clampett, R. A. Ellis, Jr., Daniel, Clampett, Ellis, Rittershouse & Dalton, Springfield, for defendant-respondent American Family Mutual Insurance Co.

Edward G. Farmer, Jr., James E. Brown, Joplin, for defendant-respondent, Western Fire Insurance Co.

Pinnell & Monroe, Monett, for defendant, Karen Sue Fleming.

TITUS, Judge.

This reconnoitering action was instituted to shanghai two insurance policies aboard

a $100,000 damage suit now at anchor and ready to set sail in the Circuit Court of Lawrence County, Missouri. The damage suit defendant called upon the two respondent insurance companies to defend her in that action and to pay any adverse judgment that might be rendered. When the companies declined the honor, she then instituted the present declaratory judgment procedure to determine the disputes among the parties.[1]

Following transfer of this case from the Circuit Court of Lawrence County, the erudite judge of the Circuit Court of Newton County decided the matter without the aid of a jury and the disappointed parties (the damage suit plaintiff and defendant) have perfected their separate appeals to this Court which we have consolidated for consideration. Although the damage suit petition claims $100,000 in damages, that suit is still pending and the pleadings in our instant case do not request money judgments. Therefore, short of surmise and conjecture, we have no way of knowing what the money judgment, if any, will be in the damage suit or the amount of monetary interest either appellant might acquire under the policies, even assuming their positions are correct. Consequently we have jurisdiction of this case on appeal.[2]

The Lutheran Church and Lutheran School are on opposite sides of Highway H as it runs north and south through the corporate limits of Freistatt, Missouri. The home of Oscar and Mable Bremer, husband and wife, and their son Robert (sometimes called "Bobby"), is located about one-half mile north of the church and school. Mr. and Mrs. Bremer were title owners of the 1960 Ford automobile involved in the accident in question. This vehicle was described in the automobile liability insurance policy issued to Oscar Bremer, as the sole named insured, by The American Family Insurance Company, a respondent here and hereinafter called "American." The omnibus clause in American's policy designated "persons insured" to be "[1] the named insured," and "[2] any other person using such automobile with the permission of the named insured, provided his operation or, if not operating, his other actual use thereof is within the scope of such permission." The term "named insured" was defined to mean "the individual or husband and wife named as such in the declarations, but if only one individual is named, the term 'named insured' also includes his spouse if a resident of the same household."

Patricia Ann Helmkamp, minor daughter of Ivan Helmkamp, is the plaintiff-appellant here and the damage suit defendant in the action pending in the Circuit Court of Lawrence County. Western Fire Insurance Company, hereafter called "Western" and a respondent in this Court, had issued its automobile liability insurance policy to Ivan Helmkamp and, in respect to "Use of Other Automobiles," afforded coverage to "any relative of such named insured or spouse." However, this coverage did not apply "to any automobile * * * used without the express or implied permission of the owner." In this case, Western's liability, if any, "shall be excess insurance over any other valid and collectible insurance."

Karen Sue Fleming was a minor passenger in the 1960 Ford driven by Patricia Helmkamp at the time of the accident. She is the damage suit plaintiff and the defendant-appellant here. Wilfred L. Atwell was local agent for American. Our

---

1. Rule 87, V.A.M.R.; Sec. 527.010 et seq., V.A.M.S. The curiosity of those concerned with the existence of a justiciable controversy herein and the permissibility of the parties to maintain such a cause may be sated by reference to Fidelity and Casualty Co. of New York v. Western Casualty & Surety Co., Mo.App., 337 S.W.2d 566, and cases therein cited.

2. Cotton v. Iowa Mut'l Liability Ins. Co., 363 Mo. 400, 251 S.W.2d 246; Mo.App., 260 S.W.2d 43, 44; Missouri Managerial Corporation v. Pasqualino, Mo.App., 323 S.W.2d 244; Sec. 477.040 V.A.M.S.

decision in this case has made it unnecessary to determine whether or not Mr. Atwell possessed all the attributes of agency to bind American with his words and conduct. Likewise, we do not undertake to delve into the authorities cited us by appellants in support of their urging that parol evidence is admissible in a reformation case to prove the true intentions of contracting parties where ambiguity or mutual mistake exist, or that, under proper circumstances, an oral contract of insurance can be enforced. Without deciding these matters in relation to this case, we have simply assumed the agency, accepted at face value all the oral testimony offered, and acknowledged the general principle that oral insurance contracts are possible when proven legally.

The Walther League, we are told, is a religious organization of the Lutheran Church for young people and that youngsters commence participating in the league at about the age of fourteen years. League meetings in Freistatt are held in the Lutheran School most every Wednesday commencing at 8 P.M. and concluding around 10:15 or 10:30 P.M.

Robert Bremer, who was sixteen years old on January 23, 1963, and Patricia Helmkamp, a junior in high school that same year, had been acquainted since they were third grade classmates in the Lutheran School. Both were members of the Walther League, but had never "dated," and Robert had never taken Patricia to or from a meeting in the Bremer family car. While their parents were acquainted, they did not visit socially, and to her recollection Patricia had been a guest in the Bremer home on only one occasion, which was to attend a birthday party when she and Robert were in the third or fourth grade.

When Robert secured his driver's license in about March of 1963, his parents did not "turn him loose" with the 1960 Ford. Rather, they accompanied him while driving to observe his ability, and it was a month or a month and a half thereafter before he was permitted to take the car alone to a Walther League meeting. In reference to taking the Ford to League meetings, Mr. Bremer told his son "I expected him to take the car, park it unless he had a girl friend to take home." Mr. Bremer further admonished Robert that "I expected him to tell us where he was going, if he took the car, and be in at eleven. * * * I told him not to do any unnecessary driving, to be careful and not drive fast, and I expected him to take care of the car. That's what I told him." Mr. and Mrs. Bremer never discussed with Robert the matter of allowing, or not allowing, others to drive the family automobile. "I never thought of it, and it never dawned on me." Robert was permitted to take the Ford alone less than "the average of twice a week" although "it was kind of an understanding" he could take it to Walther League.

Patricia Helmkamp testified that it "was not at all unusual," either before or after the Wednesday league meetings for one "kid" to drive another "kid's" car and this driving would be "either around the block or south to the first corner or north to the corner." Robert asserts that before the date of the accident he had never given anyone permission to drive the Bremer car. A young lady witness said she had driven the Ford one time with Robert's permission, but could not state when this transpired. In any event, before the accident date Patricia had never operated the Bremer car and neither Mr. Bremer nor Mrs. Bremer had any reason to believe she would ever drive it or that Robert would let anyone drive the car when it was entrusted to him. What the practices of the "kids" may have been at League meetings in operating automobiles was entirely unknown to Mr. and Mrs. Bremer.

On Wednesday, November 27, 1963, Robert announced he was going to Walther League. His father told him to "have a good time, be careful, be a good boy, and be in at eleven." Robert departed home

driving the 1960 Ford and parked it in front of the school twenty to twenty-five minutes before eight. While talking with some friends, Patricia approached and asked Robert for the keys to the Bremer car. Robert recalled Patricia wanted the car to "drive around the block," but Patricia has no recollection of any restrictions being placed on where she might operate the Ford and says she did not tell Robert where she intended to go. Patricia just "put on that womanly charm" and Robert tossed her the keys. Accompanied by Karen Fleming and three other girls, Patricia got into the Ford, circled the block and returned to in front of the school. By that time the Ford had "caught up with" a vehicle being driven by an acquaintance. Patricia, instead of stopping in front of the school, followed this vehicle north on Highway H, and when the Ford was one and three-fourth miles north of the school it became involved in the accident from which the damage suit ensued.

The policy issued Oscar Bremer by American was to be effective for an initial period of six months from March 17, 1962, to September 17, 1962. The policy was renewable for successive six month periods upon payment of premium notices, and had been renewed from September 17, 1962, to March 17, 1963, from March 17, 1963, to September 17, 1963, and from September 17, 1963, to March 17, 1964. Oscar Bremer had purchased the Ford and paid all the insurance premiums without any financial assistance from his son, Robert.

After Robert became sixteen and about the time he was to secure his driver's license, Oscar Bremer "called" Mr. Atwell. Because the testimony regarding this "call" is short, we attempt to quote all that is pertinent:

Oscar Bremer: "Q. Mr. Bremer, at the time Bobby became 16 years of age did you notify your insurance agent to that effect? * * * A. I most certainly did * * * Q. Did you tell him you wanted Bobby on the policy just like you

and your wife? Is that what you told him? A. Yes, sir * * * Q. Do you mean when this boy became 16, an additional premium was charged you on your contract for insuring this boy? A. Yes, sir. Q. And when did this occur? A. I notified him about a week or so before the boy was going to apply for his driver's license, which I thought was the necessary thing. Q. And was this before the accident? A. Oh, yes * * * Q. And at that time [after the accident] did you tell your agent that your car was being driven by Patricia Helmkamp? A. Yes, sir * * * Q. And at that time did not your agent tell you that you were covered under your liability insurance and under your collision coverage? A. Mr. Atwell didn't make any statement to that effect because he didn't know."

Mr. Atwell: "Q. So that a new declarations was issued then, as I understand it, only when, one, there is a change of car; or, secondly, when there was a change of coverage or premium? A. Or classification. Q. In this instance on plaintiff's Exhibit Number 3 [declarations dated April 1, 1963, issued by American and sent to Mr. Atwell for signing and delivery to Oscar Bremer] can you tell by looking at it what would have caused that to be issued? A. In my judgment it would be because of adding the young son as a driver. Q. And for that you simply charged an additional premium? A. That's right * * * Q. On the face of the declarations the named insured is exactly as it had been before? A. That's right * * * Q. Do you happen to recall a conversation with Mr. Bremer at the time Bobby became sixteen or was close to it? A. Not entirely but * * * Q. Do you remember whether or not Mr. Bremer told you at that time that he wanted Bobby insured like he and his wife were? A. If I am not mistaken, that's what Mr. Bremer said. He called me, wanted me to add his boy to the policy."

Following Mr. Bremer's "call" to Mr. Atwell, the latter, by a memorandum dated April 1, 1963, wrote to American: "Mr. Bremer has a boy that is now 16 years old and will drive the car about 5% of the time his name is Robert F. Bremer he was 16 the 23rd of Jan. he looks like a good risk."

After receipt of this memorandum, American issued the "Declarations" dated April 1, 1963, to cover the period of April 1, 1963, to September 17, 1963. An additional $30 premium was charged Mr. Bremer, which he paid. The "Declarations" did not undertake to change the name of the "named insured," the policy period, the amount of coverage or the description of the automobile. American contends the "declarations" was issued to indicate a classification change had been made because a "youthful driver" was to be added to the list of expected operators of the vehicle and that the added premium was charged for this reason.

Patricia Helmkamp's petition in this case contained allegations as to the policies of both American and Western in the manner which we have recited generally, and stated that American had refused to defend the damage suit because Patricia did not have Oscar Bremer's permission to drive the Ford, or if she did have such, her use thereof was not within the permission granted. The petition also noted Western's refusal to defend upon its contention that if American's position was correct, then Western afforded no coverage, but if American was wrong, then Western's policy only provided excess coverage. Preceding the prayer, paragraph 9 of the petition avers: "That under the terms and provisions of 'American Family' policy plaintiff is entitled to have 'American Family' take over the defense of the action filed by Karen Sue Fleming, to pay

any judgment that may be rendered up to the limits of its said policy, and that 'Western' is liable under its policy, up to the limits of its policy for any excess judgment that may be rendered over and above the limits of the 'American Family' policy."

Appellant Karen Sue Fleming insists the trial court erred in overruling her motion for judgment on the pleadings against Western. The motion, as written, asserts Western had admitted paragraph 9 of plaintiff's petition, quoted supra (as well as admitting the first eight paragraphs thereof), and moved the court to enter judgment in her favor against Western "decreeing that * * * Western * * * is liable under its policy * * * up to the limits of said policy for any excess judgment that may be rendered in favor of said Karen Sue Fleming and against Patricia Ann Helmkamp * * * over and above the limits of the American * * * policy."

A motion for judgment on the pleadings is not favored by the courts. 41 Am.Jur., Pleading, Sec. 336, p. 521. The word "pleadings" is plural, and the motion cannot be considered as made on the pleadings where it is made on one pleading alone. 71 C.J.S. Pleading § 425, p. 864. The court, when confronted with such a motion, considers the whole record, and before such a motion may be granted *all* the averments in *all* the pleadings must show there exists no material issue of fact and that simply a question of law is presented. 71 C.J.S. Pleading § 427, pp. 870–871, and § 429, p. 872. "In other words, the motion cannot be sustained, unless under the admitted facts the moving party is entitled to judgment without regard to what the findings might be on the facts upon which the issue is joined." [3] Like a demurrer, a motion for judgment on the pleadings admits only facts well pleaded but not conclusions or the pleader's construction of the subject

3. Ralph D'Oench Co. v. St. Louis County Cleaning & Dyeing Co., 358 Mo. 1072, 218 S.W.2d 609, 611; 1A Federal Practice & Procedure, Rules Edition, Barron & Holtzoff-Wright, Sec. 360, p. 401; Lytle v. Payette-Oregon Slope Irr. Dist., 175 Or. 276, 152 P.2d 934, 941–942, 156 A.L.R. 894.

matter. Hunter v. Delta Realty Co., 350 Mo. 1123, 169 S.W.2d 936, 938.

▮ It is obvious the allegations of paragraph 9 of the petition were mere conclusions of the pleader and an effort to summarize the ultimate contentions of the plaintiff. Admission of such conclusions do not justify favorable ruling on a motion for judgment on the pleadings. Several issues of fact were made by all the pleadings that could not be determined under the motion for judgment on the pleadings. The trial court was correct in overruling that motion.

▮ Patricia Helmkamp contends there was an agreement between Oscar Bremer and Mr. Atwell, as agent for American, that Robert Bremer was to be added as a "named insured" on American's policy and that in her declaratory judgment action the trial court should have reformed the insurance contract to reflect the "true" agreement and declare Robert to be a named insured. In her pleadings, Karen Fleming declares there was an oral contract of insurance making Robert a "named insured" and that such oral contract should be enforced. Patricia and Karen urge a further finding that Patricia had the implied permission of Oscar Bremer to drive the Ford at the time of the accident, it being admitted she did not have his express consent. If appellants were successful in establishing Robert as a "named insured" in American's policy, then Patricia, who had Robert's permission to drive the Ford, would be an insured under that policy, provided her use thereof was "within the scope of such permission." Proof of this would

not necessarily serve to corral Western, because its "Use of Other Automobiles" provision applied only if Patricia had the "implied permission of the *owner*" (our emphasis) of the Ford. Therefore, proof of Oscar Bremer's implied permission was necessary to complete the coup as to both American and Western. The trial court found against Patricia and Karen on all scores which means that we must "review the case upon both the law and the evidence as in suits of an equitable nature," being mindful that "[t]he judgment [of the trial court] shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." [4] While we are interested in the reasons related by the trial court for its findings, our chief concern is whether that court's ultimate result was correct.[5]

▮ Although the tines with which each appellant probes are bestowed with different appellations, their purposes are synonymous. A party claiming reformation must, ex necessitate, prove the existence of a prior or preceding agreement between the parties just as a party claiming an oral contract must prove such an agreement was made.[6] To qualify a court to reform a written instrument the evidence must be clear, cogent, convincing, and leave no room for reasonable doubt.[7] The evidence "must go beyond a mere preponderance of the testimony and remove all reasonable doubt. * * * Or, to express it in another way, the proof to justify such action on the part of the court must be so clear, convincing, and complete as to exclude all reasonable doubt in the mind of

4. V.A.M.R. Rule 73.01(d); V.A.M.S. Sec. 510.310(4); Holman v. Fincher, Mo.App., 403 S.W.2d 245, 251; Chailland v. M.F.A. Mutual Ins. Co., Mo. (En Banc.), 375 S.W.2d 78, 79.

5. Venie v. South Central Enterprises, Inc., Mo.App., 401 S.W.2d 495, 498; Edgar v. Fitzpatrick, Mo., 377 S.W.2d 314, 318; Producers Produce Co. v. Industrial Commission, 365 Mo. 996, 1004, 291 S.W.2d 166, 170.

6. Dougherty v. Dougherty, 204 Mo. 228, 102 S.W.2d 1099, 1101; Snider v. Miller, Mo.App., 352 S.W.2d 161, 165; Edwards v. Zahner, Mo., 395 S.W.2d 185, 190.

7. Binswanger v. Employers' Liability Assur. Corp., 224 Mo.App. 1025, 28 S.W.2d 448, 453; Edwards v. Zahner, supra, 395 S.W.2d 185, 190; Allan v. Allan, Mo., 364 S.W.2d 578, 581; 20 Am.Jur., Insurance, Sec. 354, pp. 714–715.

the chancellor." [8] Parol contracts of insurance likewise must be clearly and convincingly established or the court will refuse relief or remedy, whether at law or in equity. 1 Couch on Insurance 2d, Sec. 14.-21, pp. 598–599, and cases there cited. While it is not necessary to prove the parties had agreed upon any particular language to be used in the contract, nevertheless the evidence must reveal an agreement to accomplish a particular object and must be sufficiently definite to enable the court to determine the exact meaning and fix definitely the legal liabilities of the parties.[9]

◼ Testimony upon which appellants rely to reform the policy or to induce belief an oral contract was made adding Robert Bremer as a *named* insured to American's policy is exceptionally limited. The only utterances to this point are that Oscar Bremer answered "Yes, sir," to the question "Did you tell him [Mr. Atwell] you wanted Bobby on the policy just like you and your wife?" Mr. Atwell, responding to a similar question said: "If I'm not mistaken, that's what Mr. Bremer said. He called me, wanted me to add his boy to the policy." The words "named insured," in reference to Robert, were never spoken or written. The trial court was correct in not accepting these brief statements as constituting clear, cogent, and convincing evidence of a definite and exact agreement Robert was to be a named insured on the contract.

◼ Appellant Karen Sue Fleming argues it was impossible for Robert to be insured in the same degree as Mr. and Mrs. Bremer unless he too was a named insured. This urging is not necessarily so, for when Robert operated the Ford with the permission of one or the other of his parents he would be insured to the same degree as his

mother and father. Appellant Patricia Helmkamp directs attention to the fact that under the omnibus clause in American's policy anyone, including Robert, who drove the Ford with the permission of Oscar or Mable Bremer would be an assured under the policy whether or not the April 1, 1963, declarations had been issued or the $30 charge had been paid. The desired inference is the $30 was charged and paid to make Robert a named insured. While courts may not have yet taken judicial notice that insurance rates increase when a youthful driver commences operating the family automobile, it is a well-known shocking reality to the premium-paying parent of every sixteen year old American male who obtains an operator's license. Oscar Bremer says he contacted Mr. Atwell after Robert was sixteen and was about to apply for his driver's license because "I thought [that] was the necessary thing." Mr. Atwell further asserted the April 1, 1963, declarations was issued "because of adding the young son *as a driver*" (emphasis ours) and other testimony offered by American indicates this was the reason the $30 was charged and the declarations was issued. We cannot, therefore, disagree with the apparent belief and finding of the trial judge that the $30 was charged because Robert was to start driving the Ford, rather than because of any intention to make him a named insured. One obvious goal sought by appellants is to endow Robert with authority to permit the family car to be driven by anyone of his selection irrespective of the desires or knowledge of his parents. In light of the bridle Mr. and Mrs. Bremer maintained on their son and his use of the Ford, it is most doubtful appellants' interpolations were among Oscar Bremer's intentions when he conversed with Mr. Atwell.

Appellant Helmkamp asserts "The only reason Robert Bremer was not named in

---

8. Stubblefield v. Husband, 341 Mo. 38, 106 S.W.2d 419, 423; Thornburgh v. Warson Village Corp., Mo.App., 331 S.W. 2d 144, 148.

9. Allen v. Smith, Mo.App., 375 S.W.2d 874, 880; 17 Am.Jur.2d Contracts, Sec. 76, pp. 415–417.

the declarations was because the agent failed to make that request in his letter to American Family," but the text of the memorandum would require some stretch of the imagination to assume Mr. Atwell understood a sixteen year old boy who did not then possess a driver's license and who was going to drive the Ford only "about 5% of the time" was to become a named insured on the policy. It is also to be noted the April 1, 1963, declarations (which did not effect an addition of Robert to the policy as a named insured) was sent to Mr. Atwell, who in turn signed it and forwarded it to Oscar Bremer. Neither Mr. Atwell nor Mr. Bremer voiced any complaints as to the form or effect of the declarations at that time; neither was any protest made when the policy was renewed on September 17, 1963. It was not, as far as the record reveals, until after the November 27, 1963, accident, and until after the $100,000 damage suit was suggested or filed that any formal effort was made to make Robert a named insured.

 Equally. important, we feel, is the fact the transcript reveals Oscar Bremer told Mr. Atwell he "wanted" his son on the policy just like he and his wife, or *"wanted"* Mr. Atwell "to add his boy to the policy." The curtain then falls, so we know not what, if any, further dialogue was had. That a contract consists of an offer and an acceptance, or, in other words, a meeting of the minds, is so elementary as to make unnecessary any citations on the subject. We do not here propose to determine whether what Oscar Bremer *"wanted"* constituted an offer, a proposal, or an invitation. Regardless, the record is void as to any acceptance on the part of Mr. Atwell, any assurance on his part that what Mr. Bremer *"wanted"* would be done, or any expression that would indicate either he or American would accede to the wants and desires of Oscar Bremer. The memorandum of Mr. Atwell to American and the conduct of the parties subsequent to the reported conversation do not supply the deficit. The burden was on appellants to prove the existence of a contract, and ex necessitate, they were required to prove both an offer and an acceptance. We do not find proof of such elements in the record.

Cases cited by appellants are not pertinent to the conclusion they would incite. Chailland v. M. F. A. Mutual Insurance Company, supra, Mo. (En Banc.), 375 S. W.2d 78, involved a Mr. Smiley who, in need of insurance to secure an I. C. C. permit for operation of his tractor-trailer unit, went to defendant's agent, explained what kind and amount of coverage was needed, was told the amount of the premium, paid a part of the premium, and was assured by the agent he "was insured." The Supreme Court, agreeing with the trial court, held the evidence "convinced" the court an oral contract and all the elements thereof had been amply proved. Voss v. American Mutual Liability Insurance Co., Mo.App., 341 S.W.2d 270, unlike the matter at hand, was a case where "there can be no doubt that plaintiff offered substantial evidence of an agreement between herself" and the agent that plaintiff was insured pending issuance of the regular policy of insurance. Wackerle v. Pacific Employers Insurance Co. (CA8, Mo.), 219 F.2d 1, 52 A.L.R.2d 814, also cited by appellants, is a case involving a driver-exclusion rider issued subsequent to the inception of the policy. The rider was held void for lack of consideration.

Edwards v. Zahner, Mo., 395 S.W.2d 185, is cited to us by appellants, although it appears contrary to their contentions. In this reported case Robert B. Zahner entered into a written agreement with Airway Flight Service, Inc., to lease a certain airplane, with option to purchase, for a stated consideration. Zahner paid the premium on the insurance in question by reason of it having been included in the total sum he was to pay as evidenced by his promissory note. The insurance policy specified Airway Flight Service, Inc., as the named insured, and applied "when the aircraft is in flight, only while being oper-

ated by the following pilot[s]: Any Pilot employed by the Named Insured and who holds a valid Commercial Pilot Certificate." Zahner flew several charter flights as an employee of Airway Flight Service, but at the time of the accident he was on a charter flight of his own. Thereafter, reformation of the policy was sought to make Zahner a named insured under the policy. In affirming the circuit court ruling against reformation, the Supreme Court said: (1. c. 190–191): "The burden of proof in this reformation case was upon appellant to show by clear and convincing evidence that the agreement of the parties was that Zahner was *intended* to be a named insured and covered at all times under the liability portion of the policy. * * * The difficulty here is with the sufficiency of appellant's proof as to what McAnally [the agent] knew with respect to any agreement made prior to the issuance of the policy * * * Here, the only testimony as to any prior agreement is to the effect that insurance was discussed between Zahner and McAnally, that Zahner thought that he had insurance; witness Jones testified that he was sure but not positive that McAnally told Zahner he was covered by the policy; and it is clear that Zahner paid the premium thereon. The record is silent, however, as to any agreement or intent of the parties (McAnally, as agent, and Zahner) that the premium paid was to cover anything beyond what was specified in the policy, i.e., 'Any Pilot employed by the Named Insured and who holds a valid Commercial Pilot Certificate.' Absent such evidence, the trial court was justified in concluding from other evidence adduced that it was intended (as respecting passenger liability here in issue) that the policy cover Zahner and Airway Flight Service, Inc., only when Zahner was flying as an employee of that named insured * * *

Although the fact that Zahner paid the premium could create a rebuttable presumption, that he was expecting liability coverage in his own name, we cannot say from this fact, when coupled with other facts, that the prior agreement was to include him as a named insured so that he would be protected by liability insurance when on charter flights of his own not connected with any employment by Airway Flight Service, Inc."

The evidence in the instant case is less compelling than that offered in favor of reformation in the Edwards case, supra. When we marshal all the available facts and circumstances shown, we are in no position to dispute the trial court's ruling on appellants' first contentions and conclude Robert was not intended to be a named insured in the policy issued by American.

Another complaint of appellants is the trial court erred in its finding that Patricia Ann Helmkamp did not have the implied permission of Oscar Bremer to drive the Ford at the time of the accident. We have been cited cases from sister states with the suggestion those authorities should apply. Generally speaking, such cases to which we are referred fall in two categories. First are cases from states which purportedly have adopted the so-called initial permission rule, i.e., where the named insured grants his permittee broad control over his automobile, he impliedly authorizes his permittee to allow a third person to use it, thus rendering the latter an additional insured.[10] Missouri courts have not as yet, to our knowledge, fired such a broadside into the omnibus clause of an automobile liability insurance policy. The second class of cases appellants cite are those that permit recovery under the omnibus clause where the original permittee (user of the automobile) is riding in the car

10. National Grange Mutual Liability Co. v. Metroka (CA3, Pa.), 250 F.2d 933; 7 Am.Jur.2d Automobile Insurance, Sec. 116, p. 431; Hays v. Country Mut'l Ins. Co., 38 Ill.App.2d 1, 186 N.E.2d 153, cited in the brief of one of the appellants, has been reversed outright by the Supreme Court of Illinois in Hays v. Country Mut'l Ins. Co., 28 Ill.2d 601, 192 N.E.2d 855.

with the second permittee at the time of the accident, or, the second permittee (without the first permittee present) is otherwise serving some purpose for the first permittee.[11] In this case Robert Bremer was not in the Ford when the accident occurred and Patricia Helmkamp was not on an errand for Robert or in any manner using the Ford for his or his father's benefit. Consequently, this second class of cited case is not applicable to the facts confronting us.

Permission under the omnibus clause may be express or implied, but it must originate in the language or conduct of the named insured or someone having authority to bind him in that respect, and the person claiming permission must prove it.[12] While Mr. Bremer never told Robert specifically he was not to let anyone operate the Ford while it was entrusted to his care, permission is something more than mere sufferance or tolerance without taking steps to prevent.[13] Implied permission is neither proved nor inferred from the mere fact Miss Helmkamp obtained possession of the car without Oscar Bremer's knowledge.[14]

Both of the appellants rely heavily on Winterton v. Van Zandt, Mo., 351 S.W.2d 696, in urging liberality in our consideration of this case and suggesting we ignore the cases of M. F. A. Mutual Insurance Co. v. Alexander and Nye v. James, already herein cited in footnotes. The trouble with this suggestion is the Winterton matter did not involve a situation of the original permittee turning the use of the insured vehicle to a third person, but determined whether or not the one and only permittee had exceeded the permission which had been granted him by the owner and named insured. There is no indication in the record before us that American's policy was anything but a voluntary contract between it and Oscar Bremer. The safety responsibility law of Missouri has no application to the policy in question whereas in the Winterton case the policy provided it "shall comply with the provisions of the motor vehicle financial responsibility law of the state," and was issued under Sec. 303.170, V.A.M.S.[15] Regardless of these distinctions, Section 303.190, subd. 2(2), V.A.M.S., provides that additional insureds are those "using any such motor vehicle or motor vehicles with the express or implied permission of such named insured," just as American's policy provides.

Appellants place much stock in Patricia Helmkamp's testimony (and other similar recitals) that it "was not at all unusual" for one "kid" to drive another "kid's" car either before or after the Walther League meetings. However, what the practices of the "kids" were or what transpired at these gatherings was not within the knowledge of Oscar Bremer and cannot be imputed to his knowledge. In this case "[t]here is no room * * * for application of the rule of prior conduct." M. F. A. Insurance Co. v. Lawson, Mo.App., 336 S.W.2d 123, 125. Although one girl testified Robert had allowed her to drive the Ford on one occa-

11. Loffler v. Boston Ins. Co. (Mun.Ct. of App., Dist. of Col.) 120 A.2d 691; Dodson v. Sisco (D.C.Ark.) 134 F.Supp. 313; 160 A.L.R. 1195, 1206; Teague v. Tate, 213 Tenn. 269, 375 S.W.2d 840; Grant v. Knepper, 245 N.Y. 158, 165, 156 N.E. 650, 652, 54 A.L.R. 845; 7 Am.Jur.2d Automobile Insurance, Sec. 117, p. 435.

12. Hanover Ins. Co. v. Abchal, Mo.App., 375 S.W.2d 605, 608–609; Nye v. James, Mo.App., 373 S.W.2d 655, 660; Varble v. Stanley, Mo.App., 306 S.W.2d 662, 666; M.F.A. Mutual Ins. Co. v. Alexander, Mo. App., 361 S.W.2d 171, 179; McKee v. Travelers Ins. Co., Mo.App., 315 S.W.2d 852.

13. Haynes v. Linder, Mo.App., 323 S.W.2d 505, 510; Nye v. James, supra, 373 S.W. 2d 655, 660; M.F.A. Mutual Insurance Co. v. Alexander, supra, 361 S.W.2d 171, 179.

14. See cases cited in Footnote 12, supra.

15. Perkins v. Perkins, Mo.App., 284 S.W. 2d 603; Gabler v. Continental Casualty Co., Mo.App., 295 S.W.2d 194; State Farm Mutual Auto Insurance Co. v. Ward, Mo., 340 S.W.2d 635.

sion, Robert denied he had ever permitted anyone to use the Ford before the date of the accident. In any event, it is clear Patricia had never driven the Bremer car prior to the date of the accident. But what if Robert had let other "kids" drive the family car on other occasions? The fact still remains that Oscar Bremer had absolutely no knowledge of such doings and his implied consent thereto cannot be milked from innocent ignorance.

It is further urged by appellants that when Mr. Bremer permitted Robert to use the automobile to go to the league meeting with "no other instructions, restrictions, or admonishments" than "be a good boy, have a good time, take care of the car, and be in by eleven o'clock," he afforded Robert carte blanche "to do what the son considered proper with the car." This overlooks the fact the permission given was for Robert to take the car *to the league meeting* and that Mr. Bremer had previously told his son "I expected him to take the car, park it unless he had a girl friend to take home." Patricia denied she was Robert's "girl friend" and the evidence is clear Robert had never taken Patricia to or from a league meeting. Even so, Mr. Bremer had no reason to believe the permission granted Robert would entail operation of the family automobile by Patricia or anyone other than Robert. Without knowledge by Oscar Bremer that Patricia was using the Ford, no permission therefor could be implied. McKee v. Travelers Ins. Co., Mo.App., 315 S.W.2d 852, 855.

█ The "social relationship" between the parties is also seized upon by appellants to show either justification for an unproved assumption Oscar Bremer would condone what Robert did in succumbing to Patricia's "womanly charm," or that Oscar Bremer should be held to the notion Robert would be motivated to further the social relations between him and Patricia by permitting her to operate the Ford. The issue is not whether Robert gave Patricia permission or why he granted her leave. The burden was upon appellants to show that Oscar Bremer either through his words, conduct, or the nature and scope of the permission granted by him to Robert, indicated Robert, in turn, would be clothed with authority to pass on Oscar Bremer's permission to Patricia. There assuredly is nothing special about the social relationship existing between the Bremer family and the Helmkamp family, or between Robert and Patricia, that would give rise to an implication of anticipation on Oscar Bremer's part that his son would turn over to Patricia the use of the family automobile.

█ The peculiar question in this case is: Was the use of the Ford by Patricia *at the time* of the accident with the implied permission of Oscar Bremer? The question was asked Mr. Bremer if "on some occasion after this accident had occurred, did you make some statement to your wife to the effect that if Patricia had asked you for the keys to the car that you would have given them to her, that you thought that much of her, or words to that effect?" Mr. Bremer replied: "I didn't say it exactly like that. I was referring to my son, if I would have been his age, I might have done the same thing. I am not denying the fact that I didn't say that I thought a lot of Patricia." No matter what Mr. Bremer may have recognized as imperfection in his son, or have recalled as similar foibles of his youth, subsequent ratification by him of Patricia's operation of the Ford would not suffice to supply evidence that Patricia had his permission *at the time* of the casualty.[16] Implied permission comes from what transpired *before* the use in question (Mazdra v. Selective Ins. Co., Mo., 398 S.W.2d 841, 844), and what the named insured may assert after the accident what he would have done prior thereto has no

16. Hanover Insurance Co. v. Abchal, supra, Mo.App., 375 S.W.2d 605; C. H. Elle Const. Co. v. Western Casualty and Surety Co. (CA9, Idaho) 294 F.2d 459, 462; Johnson v. State Farm Mut. Automobile Ins. Co. (CA8, Neb.) 194 F.2d 785, 787.

probative value or relevancy. American Insurance Co. v. McMichael (DC, Mo.) 238 F.Supp. 154, 156–157; Bekaert v. State Farm Mutual Auto. Insurance Co. (CA8, Neb.) 230 F.2d 127.

The facts and contentions involved in the instant action are fairly well contained in Duff v. Alliance Mutual Casualty Co. (CA10, Okla.) 296 F.2d 506. In that case, Marvin O'Kelley, the named insured, had a son named Pete. Pete and Terry Duff had been intimate friends, neighbors, and schoolmates for some five or six years, and had enjoyed the free run of each other's homes. After they were sixteen, had obtained their driver's licenses and access to the use of their respective family cars, each boy had allowed the other to drive "his" car on frequent occasions. Pete had been best man at Duff's wedding. Mr. O'Kelley had never discussed with his son the matter of allowing others to drive the family car. Although well aware of the fast friendship .between the two boys, Mr. O'Kelley had no knowledge of any instance when Pete had allowed Duff to drive the car and did not know, until after the accident, that Pete had permitted Duff to drive the car at the time of the casualty. On the date in question, Pete had his father's permission to drive the family automobile to work. Duff met Pete at work, and with Pete's consent, borrowed the car to seek some person that would give him a ride to school at Stillwater, Oklahoma. While Duff was driving the O'Kelley car on this mission, the accident occurred. Mr. O'Kelley's insurance carrier instituted a declaratory judgment action against Duff and those having claims against him because of the accident. The trial court found for the carrier, and Duff et al. appealed. Appellants contended "that the intimate relationship between the O'Kelley and Duff families, viewed in the light of the Oklahoma Safety Responsibility Act * * * make a finding of implied consent mandatory," i. e., that Duff had Mr. O'Kelley's implied consent to operate the automobile.

Affirming the trial court, the Circuit Court of Appeals (1. c. 508–509) said:

"The intimate friendship of the O'Kelley and Duff families does not, as a matter of law, carry with it the implied permission to borrow the family car absent knowledge of the existence of such a practice. And, since the particular purpose for which Duff borrowed the car and the actual use made of the car were not to serve any purpose, benefit, or advantage to either Mr. O'Kelley or his son, the case falls squarely within the rule set forth in Samuels et al. v. American Automobile Ins. Co., 10 Cir., 150 F.2d 221, 223, 160 A.L.R. 1191: 'It has generally been held that where A, the owner of an automobile, gives general permission to B to use the automobile and B gives permission to C to use the automobile solely for C's purpose, benefit, or advantage, and the automobile is involved in an accident while being so used by C, such use is not with the permission of the named insured.'

"We find no merit in appellants' contention that the subsequent passage of the Oklahoma Safety Responsibility Act * * * requires a re-examination of Samuels or a modification of the clear limitation placed upon coverage in the wording of the policy of insurance * * *. The policy was voluntarily carried by Mr. O'Kelley. In such case the Oklahoma Supreme Court considering a case of non-coverage, has held, U. S. Fidelity and Guaranty v. Walker, (Okla. 1958), 329 P.2d 852, 853, 'A policy * * * voluntarily carried by an operator who has never been required to furnish proof of financial responsibility under provisions of the safety responsibility act, and not certified as such proof, is not "required by said law" and the insurer is not precluded from relying on policy defenses * * *.' "

Also see Hays v. Country Mutual Insurance Co., supra, 28 Ill.2d 601, 192 N.E.2d 855.

The Duff decision is concordant with the expressions of Missouri courts, and convinces us the Circuit Court finding that Patricia Helmkamp did not have the implied permission of Oscar Bremer to operate the Ford at the time of the accident was correct. In light of this holding, the further issue of deviation becomes moot.

What we have already said serves to unhook Western from any liability in this matter (and as so found by the trial court) because its policy, which would provide Patricia Helmkamp with coverage (excess or otherwise) while using an automobile other than the one described in Western's policy, "does not apply: [1] To any automobile * * * [i. e.] used without the express or implied permission of the owner. * * *"

Judgment of the trial court is affirmed.

STONE, P. J., and HOGAN, J., concur.